# SHOTWELL MANUFACTURING CO. ET AL. *v.* UNITED STATES.

No. 16. Argued October 11, 15, 1962.—Decided January 14, 1963.

*George B. Christensen* and *William T. Kirby* argued the cause and filed briefs for petitioners.

*Assistant Attorney General Oberdorfer* and *Joseph M. Howard* argued the cause for the United States. With them on the brief were *Solicitor General Cox* and *Frank I. Goodman.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case is here for the second time in consequence of the remand that was ordered at the 1957 Term. *United States* v. *Shotwell Mfg. Co.,* 355 U. S. 233.

In 1953 petitioners were convicted after a jury trial in the United States District Court for the Northern District of Illinois of willful attempted evasion of federal income taxes of the Shotwell Manufacturing Company for the years 1945 and 1946. Int. Rev. Code of 1939, § 145 (b), 53 Stat. 63. The individual petitioners, Cain and Sullivan, were officers of Shotwell, a candy manufacturer. The charge was that the company's tax returns for these years had not reported substantial income, received from one Lubben, on sales of candy above OPA (Office of Price Administration) ceiling prices—so-called black-market sales.

On appeal the convictions were reversed and a new trial ordered by a divided Court of Appeals on the ground that the District Court should have ordered suppressed certain evidence, used at the trial, which petitioners had furnished the Government in reliance on the Treasury's then

"voluntary disclosure policy." 225 F. 2d 394. In substance that policy amounted to a representation by the Treasury that delinquent taxpayers could escape possible criminal prosecution by disclosing their derelictions to the taxing authorities before any investigation of them had commenced. See 355 U. S., at 235, note 2; pp. 348–352, *infra*.

The evidence held subject to suppression consisted of tabulations purporting to show the amount of unreported black-market income received by Shotwell from Lubben during the two tax years in question, and offsetting black-market payments by Shotwell for the purchase of raw materials which almost matched the black-market receipts. Concluding that petitioners' disclosure had been a genuine one (contrary to the District Court's finding) and that it had been made before any investigation of Shotwell's tax returns had started and was thus timely (a question not reached by the District Court, 355 U. S., at 236), the Court of Appeals held that the disclosure was valid and that the Government could not, consistently with the Fifth Amendment, use the disclosed material at petitioners' trial.

The matter then came here for review on the Government's petition for certiorari, during the pendency of which the then Solicitor General moved to remand the case to the District Court for further proceedings on the suppression issue—an issue which both sides recognized had properly been one for the court and not for the jury. 355 U. S., at 244; see *United States* v. *Lustig,* 163 F. 2d 85, 88–89, cert. denied, 332 U. S. 775. The motion was based on the claim that newly discovered evidence in possession of the Government would show that the Court of Appeals' decision as to the *bona fides* and timeliness of the alleged disclosure was the product of a tainted record, involving an attempt on the part of these petitioners "to perpetrate a fraud upon the courts." 355

U. S., at 241. Without reaching any of the questions decided by the Court of Appeals we vacated the judgment of that court and remanded the case to the District Court with instructions to reexamine the disclosure episode in light of the parties' additional evidence and that already in the record, to decide anew the suppression issue, and depending upon its decision to enter a new judgment of conviction or an order for a new trial, as the case might be. 355 U. S., at 245–246.

The District Court, after a full evidentiary hearing, again denied suppression, finding that "no honest, bona fide voluntary disclosure" had ever been made and that fraud had "permeated" the petitioners' disclosure showing at both suppression hearings and at the trial.[1]   These ultimate findings rested primarily on subsidiary findings that although Shotwell's black-market *receipts* had not in themselves been misrepresented, the claim that they had been almost entirely offset by *payments* for the purported purchase of black-market supplies was false—the truth being (contrary to what petitioners Cain and Sullivan had testified in the earlier proceedings) that most of Shotwell's black-market receipts, "totaling between three and four hundred thousand dollars," had found their way into the pockets of Cain, Sullivan and Huebner, all Shotwell officers.   The District Court also denied motions for a new trial and overruled challenges, made for the first time in July 1957, to the original grand and petit jury arrays.

The Court of Appeals, sustaining these findings and rulings [2] and overruling other challenges to the remand

---

[1] The court also held that a "dishonest and false disclosure cannot be held to be a timely voluntary disclosure."

[2] In its earlier decision the Court of Appeals rejected petitioners' plea in bar grounded on a claim of immunity.   225 F. 2d, at 397. That claim has not been renewed in their present petition for certiorari, and in any event would not be availing in light of the findings below.

and original trial proceedings, has now affirmed these convictions, 287 F. 2d 667. The case is again before us on certiorari. 368 U. S. 946. We affirm the judgment below.

I.

The principal contention is that notwithstanding the finding that Shotwell's disclosure of black-market receipts was fraudulently contrived, the Self-Incrimination Clause of the Fifth Amendment barred the Government's trial use of any of the disclosed material.[3]

Preliminarily we reject as specious petitioners' suggestion that the District Court's finding of fraud is infirm because the falsity of Shotwell's black-market payments, on which that finding principally rested, was an immaterial consideration in view of the Commissioner's then ruling that black-market payments were not includible in the cost of goods sold—in other words, that Shotwell's tax liability would have remained the same whether or not such expenditures were truthfully represented.[4] The fact is that at the time the disclosure was made the Commissioner's ruling was even then in litigation, and some six months thereafter was rejected by the Tax Court, *Sullenger* v. *Commissioner,* 11 T. C. 1076, as it also was later by several of the Courts of Appeals. See *Commissioner* v. *Weisman,* 197 F. 2d 221 (C. A. 1st Cir.); *Commissioner* v. *Guminski,* 198 F. 2d 265 (C. A. 5th Cir.); *Commissioner* v. *Gentry,* 198 F. 2d 267 (C. A. 5th Cir.); *Jones* v. *Herber,* 198 F. 2d 544 (C. A. 10th Cir.).

Indeed, the record here shows that petitioners, despite the administrative ruling, attempted to negotiate a settlement reflecting a substantial allowance of such expendi-

---

[3] The Fourth Amendment is also relied on, but that Amendment is manifestly inapposite. See *Centracchio* v. *Garrity,* 198 F. 2d 382, 387, cert. denied, 344 U. S. 866.

[4] The sufficiency of the finding as to the falsity of the expenditures is not attacked.

tures, and that in making their disclosure they reserved the right to contest the ruling by way of a suit for refund, in whole or in part, of the additional taxes to be assessed in respect of the unreported black-market income. Beyond this, had petitioners been able to convince the Treasury that Shotwell's failure to report the black-market receipts had been due to an honest, though mistaken, belief that such income could be offset by black-market expenditures, it might well have borne importantly on their liability for civil fraud penalties. Int. Rev. Code, 1939, § 293 (b).[5] In short, in making their suppression contention petitioners cannot escape the consequences of the finding that their disclosure was fraudulent.

It is of course a constitutional principle of long standing that the prosecution "must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers* v. *Richmond,* 365 U. S. 534, 541. We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self-Incrimination Clause of the Fifth Amendment. See *Bram* v. *United States,* 168 U. S. 532, 542–543; *Hardy* v. *United States,* 186 U. S. 224, 229; *Wan* v. *United States,* 266 U. S. 1, 14; *Smith* v. *United States,* 348 U. S. 147, 150. The controlling test is that approved in *Bram:* " 'a confession, in order to be admissible, must be free and voluntary: that is, . . . not . . . obtained by any direct or implied promises, however slight . . . .' " *Bram* v. *United States, supra,* at 542–543. Evidence so procured can no more be re-

---

[5] At the trial of this criminal case the District Court charged the jury that it should acquit if it believed that Shotwell's black-market receipts had been used for the purchase of black-market supplies. See 287 F. 2d, at 671, note 7.

garded as the product of a free act of the accused than that obtained by official physical or psychological coercion. But in this instance we find nothing in the circumstances under which the challenged evidence was procured that would run afoul of these jealously guarded constitutional principles.

A coerced confession claim, whether founded on a promise of immunity or otherwise, always involves this question: did the governmental conduct complained of "bring about" a confession "not freely self-determined"? *Rogers* v. *Richmond, supra,* at 544. Under any tenable view of the present situation we think it clearly did not.

The inapplicability here of the constitutional principles relied on by petitioners inheres in both the essential character of this offer of immunity and the particular response of these petitioners to that offer. The offer was nothing more than part of a broad administrative policy designed to accomplish the expeditious and economical collection of revenue by enlisting taxpayer cooperation in clearing up as yet undetected underpayments of taxes, thereby avoiding the delays and expense of investigation and litigation. The Treasury's "voluntary disclosure policy," addressed to the public generally and not to particular individuals, was not an invitation aimed at extracting confessions of guilt from particular known or suspected delinquent taxpayers. Petitioners' position is not like that of a person, accused or suspected of crime, to whom a policeman, a prosecutor, or an investigating agency has made a promise of immunity or leniency in return for a statement. In those circumstances an inculpatory statement would be the product of inducement, and thus not an act of free will. No such inference, however, is allowable in the context of what happened here. Petitioners' response, it is true, might not have been made in the absence of the Treasury's offer, but that in itself is not the test. The voluntary disclosure policy left them wholly

free to disclose or not as they pleased. In choosing to act as they did, petitioners, far from being the victims of that policy, were volunteers for its benefits.

Moreover, petitioners were not simply volunteers. Plainly the offer of immunity contained in the voluntary disclosure policy presupposed, at the very least, that a delinquent taxpayer would make a full "clean breast of things." 355 U. S., at 235, note 2. Nothing less satisfies the basic reason for the policy—"taking a sensible step to produce the revenue *called for by law* with the minimum cost of investigation" [6] (emphasis added)—and its most recent official expression at the time this disclosure was made.[7] And the record indeed shows that petitioners could not have understood otherwise.[8] Given these factors the matter then parses down to this: granting that in deciding whether to disclose or run the risk of prosecu-

---

[6] Address by J. P. Wenchel, Chief Counsel of the Bureau of Internal Revenue, to the Tax Executives Institute, May 14, 1947.

[7] "This [the disclosure policy] presumes, of course, that the repentant taxpayer cooperates with agents of the Bureau in determining the *true* tax liability." Press Release of statement by Secretary of the Treasury Snyder, May 25, 1947. (Emphasis added.) In *Centracchio* v. *Garrity, supra,* at 389, former Chief Judge Magruder, writing for the First Circuit, recognized that "it would seem that the taxpayer would have to satisfy the court that he made a voluntary, good faith disclosure of all data necessary to a correct computation of his income tax deficiencies . . . ."

[8] Busby, Shotwell's auditor, testified at the trial that he was "acquainted with the published statements of the Treasury" concerning the voluntary disclosure policy and that, in particular, he had brought to petitioners' attention the address by the Chief Counsel of the Internal Revenue Bureau quoted above in part. Cain also testified that Busby had explained the Treasury's policy to him and Sullivan. More particularly, Sauber, the Bureau's representative, testified that at the initial disclosure discussion he told Busby that Shotwell had to reconstruct the figures relating to the black-market receipts and expenditures in order to be able to file an *accurate* amended tax return, and that Cain had represented that "no one in Shotwell Manufacturing Company profited by these transactions."

tion petitioners were initially justified in relying on the Treasury's general offer of immunity, once a fraudulent disclosure had been determined upon they must be deemed to have recognized that such offer had in effect been withdrawn as to them or, amounting to the same thing, that they were no longer entitled to place reliance on it. Petitioners are thus in legal effect left in no better position than they would have been had the Treasury formally withdrawn its offer of immunity before their disclosure figures were furnished. The case, then, is not merely one of volunteers but also one in which the facts disclosed were deliberately misrepresented. Under no acceptable stretch of the *Bram* test can petitioners' disclosure in these circumstances be regarded as the product of unlawful inducement.[9] Its admission into evidence did not offend the Self-Incrimination Clause of the Fifth Amendment.[10]

---

[9] The same considerations deprive of even colorable significance the suggestion that Sauber's "assurances" to petitioners, on the occasion of their preliminary inquiry respecting the availability of the Treasury's disclosure policy to an unknown taxpayer in Shotwell's circumstances, should be deemed sufficient to bring their Fifth Amendment claim within the *Bram* test. For apart from the fact that such assurances were no more than an affirmation of the terms of the published disclosure policy of which petitioners were then already well aware, it is clear that what Sauber said was expressly conditioned not merely on a disclosure being "timely" but also on the premise that "the facts . . . [then hypothetically] related to him were correct." As already shown, the falsity of Shotwell's offsetting black-market disbursements was never revealed.

[10] A quite different case would be presented if an offer of immunity had been specifically directed to petitioners in the context of an investigation, accusation, or prosecution. A disclosure made in such circumstances would not have fallen under the voluntary disclosure policy, which by definition was applicable only to disclosures made before any investigation had commenced, and would have been inadmissible in evidence under the *Bram* test. Under the rule of *Rogers* v. *Richmond, supra,* the truth or falsity of such a disclosure would then be irrelevant to the question of its admissibility. We agree that

Finally, relevant cases in the lower federal courts confirm the view that must be reached on principle. In the comparable situation of a disclosure by a taxpayer made only after he knew an investigation of his tax returns had commenced, such courts have consistently, and correctly we think, refused to suppress the Government's use of disclosed evidence on the ground that the disclosure could not have been induced by the offer of immunity where the offer had lapsed. *United States* v. *Lustig,* 163 F. 2d 85, 88–89 (C. A. 2d Cir.), cert. denied, 332 U. S. 775; *White* v. *United States,* 194 F. 2d 215, 217 (C. A. 5th Cir.), cert. denied, 343 U. S. 930; *Bateman* v. *United States,* 212 F. 2d 61, 65–66 (C. A. 9th Cir.) (suppression also denied because disclosure not "full and complete"); *United States* v. *Weisman,* 78 F. Supp. 979 (D. C. Mass.). Similarly a dishonest disclosure cannot be deemed to have been so induced.

Petitioners rely on *Rex* v. *Barker,* [1941] 2 K. B. 381, 3 All Eng. 33 (more fully reported there), a decision of the King's Bench Division holding inadmissible in a criminal trial documents, in part fraudulent, which the defendant had produced under a similar British disclosure policy. But that case does not support their position. For though the defendant there had first made only a partial and misleading disclosure, he had then followed it up with a full and honest one, after further discussions with the Inland Revenue and in reliance on its disclosure policy. In the case before us no full and honest disclosure was ever made.

---

the rule of that case, involving a state trial, is equally applicable in a federal prosecution.

The case would also be different had the petitioners, acting under the voluntary disclosure policy, made an honest disclosure. Whether or not different constitutional principles or other considerations would then prevent the Government from reneging on its promise by using such material as evidence in a criminal trial need not now be decided. Cf. *Smith* v. *United States,* 348 U. S. 147.

Since no element of coercion or inducement, in any true sense of those terms, attended petitioners' disclosure, no inroad whatever upon constitutional rights is wrought by our rejection of this suppression claim. On the contrary, to sustain the claim would amount to turning an important constitutional principle upside down. For what we have here is not a case of incriminatory evidence having been induced by the Government, but one in which petitioners attempted to hoodwink the Government into what would have been a flagrant misapplication of its voluntary disclosure policy.

## II.

Claiming that it appeared at the second suppression hearing that Lubben, whose transactions with Shotwell formed the basis of the charges in the indictment, had testified falsely at the trial respecting the amount of his black-market payments, petitioners contend that the District Court should have ordered a new trial of the entire case. The Court of Appeals made short shrift of this contention (287 F. 2d, at 675), and we too find no substance in it.

The cornerstone of petitioners' argument is a statement made by the District Court in the course of its suppression opinion: ". . . that Lubben may have exaggerated the amounts of the payments that he and his confederates made to Shotwell is entirely probable." This statement is sought to be portrayed as a euphemism for a finding that Lubben's trial testimony was perjurious. Were that so a new trial might well be in order, as the Government acknowledges, for Lubben was undoubtedly a crucial government witness. But the record both demonstrates the hollowness of that contention and affords no other basis for disturbing the conclusions of the two lower courts that these petitioners are not entitled to a new trial.

Far from constituting a finding of perjury, the District Court's remark respecting Lubben's trial testimony was nothing more than part of a general observation that the passage of time and the absence of any contemporary records of the Shotwell-Lubben transactions made difficult the pin-pointing of the exact amount of Shotwell's unreported black-market income and the amount thereof that was personally kept by one or another of the Shotwell officers. The suppression record makes clear that the District Court did not initially address itself to the question whether Lubben's trial testimony was perjurious, and that it was not asked to do so until after its opinion denying suppression had come down.

To the contrary, the District Court had not considered it important to determine the precise amounts of Lubben's black-market payments or of the moneys that were retained by Huebner, Sullivan and Cain. It was enough that "the evidence is overwhelmingly clear that not only were" some $300,000 to $400,000 of black-market payments made to Shotwell by Lubben in the period 1944–1946, but also that "the greater part" of this money "was appropriated by Cain, Huebner and Sullivan for their own personal use." [11]

---

[11] The following is the full text of this portion of the District Court's opinion: "Some fourteen years have elapsed since the black-market operations of Shotwell took place. No record was kept by Shotwell or any of its officials as to the premium moneys paid by Lubben and his companies during the years in question. It is conceded that thousands of dollars were paid to Shotwell by Lubben and his representatives as black-market payments on candy sold to Lubben and his companies during 1945 and 1946 without any attempt on the part of Shotwell to make any written record thereof. Consequently, it is perfectly understandable that when a witness like Huebner attempts to recount the some sixteen instances when he received substantial sums of money on behalf of Shotwell as over-ceiling payments on

Petitioners' motion for a new trial, and its denial, followed the filing of the suppression opinion. In their argument before the District Court defense counsel urged, among other things, that the court had "euphemistically" found Lubben's trial testimony to have been perjurious and, more broadly, that the second suppression hearing and trial versions of the disclosure episode differed so widely as to entitle petitioners to a new jury trial of the main case.[12] In denying the motion the district judge observed that he had simply said in his suppression opin-

candy sold by that company, the amounts and circumstances as to the disposition of the money may not be too clear in his memory. However, the testimony he has given at the supplemental hearing is reasonably consistent and compatible with the testimony given by the government witnesses at the trial regarding these payments. Huebner did not take the stand at the first supplemental hearing nor during the trial; hence, his testimony as to the amounts of money received and the siphoning of these payments to various officials of the company in many instances discloses for the first time which individuals were the recipients of Lubben's payments. However, Huebner may be mistaken as to the exact amounts of money received and when the payments were made. Moreover, that Lubben may have exaggerated the amounts of the payments that he and his confederates made to Shotwell is entirely probable. But the evidence is overwhelmingly clear that not only were substantial sums of black-market money paid to Shotwell as premium payments by Lubben during 1944, 1945 and 1946 totaling between three and four hundred thousand dollars, but also that the greater part of this so-called black-market money was appropriated by Cain, Huebner and Sullivan for their own personal use. The question of good faith does not turn on the exact amount of Lubben money Huebner, Sullivan or Cain may have received for their own personal use. That Cain personally received substantial amounts of the Lubben black-market payments and that Sullivan knew of these payments and received a certain share for his personal use, but in a lesser amount than Cain and Huebner, is fully established by the record."

[12] In addition, petitioners' "Supplement To Motion For New Trial" alleged nine further grounds for a new trial, only one of which (the overruling of their challenge to the indicting grand jury array) is pressed here. *Infra,* pp. 361–364.

ion "that the amount that Lubben said he paid may have been exaggerated," and that he would grant a new trial if he thought there "was a miscarriage of justice," but that he did "not so find." A careful study of the record satisfies us that the District Court did not abuse its discretion in thus ruling.

Petitioners' argument on this score centers largely around the variances they claim to find between the testimony of Huebner (who had not testified in the earlier proceedings) at the second suppression hearing and Lubben's trial testimony as to the amount of Shotwell's black-market receipts. Huebner testified to some 16 or 17 occasions on which black-market money had been received from Lubben, all of which he said had been divided between himself, Cain and Sullivan. These payments aggregated $272,000 in 1945 and 1946, the years involved in the indictment, as compared with $454,000, Lubben's total trial figure.[13] But the indicated disparity of $182,000 is more apparent than real, for, apart from the fact that Huebner was not the only person in the Shotwell organization who had received Lubben money, and the fact that he was never asked to say whether these were

---

[13] Other more particular charges against the integrity of Lubben's trial testimony are also made: (1) that Huebner had contradicted Lubben with respect to a payment of $40,000 over-ceiling prices on certain chocolate-covered nuts (but the Huebner testimony to which petitioners refer is cloudy on this score); (2) that Huebner had testified that Lubben had "lied" with respect to a $49,000 payment to Graflund (but the record shows only that Huebner stated that he "thought it was a mistake on Lubben's part"); (3) that Huebner had testified on cross-examination that he "thought [Lubben] lied on the stand here" (but the record does not show in what respects Huebner thought this was so); and (4) that one Tobias, not called by either side at the suppression hearing, had altered Lubben's books, used in evidence at the trial (but the only basis for this assertion is Huebner's hearsay testimony that he had been present at the meeting where Tobias had so stated to Cain and Sullivan; moreover, this matter had already been testified to by Cain and Sullivan at the trial).

the only Lubben payments he himself had received, there must be added to this $272,000 total some $125,000 to $150,000 that the defense asserted had gone into a "corn box" (safe deposit box) and was actually used for the purchase of black-market supplies of corn.[14]   Hence, viewing things most favorably to the petitioners, the variance of which they make so much is at best no more than from $32,000 to $57,000.[15]

We think the District Court was fully justified in finding that Huebner's testimony "at the supplemental hearing is reasonably consistent and compatible with the testimony given by the government witnesses at the trial regarding these [black-market] payments," and that it "tends to corroborate Lubben's testimony." [16]   Such findings, made as they were in connection with what in effect was a motion for a new trial on newly discovered evidence, must "remain undisturbed except for most extraordinary

---

[14] The record shows that the "corn box" records had been destroyed on Cain's instructions.

[15] Substantiation of the charges in the indictment did not of course depend on the precise amounts of Shotwell's black-market receipts, and the jury made no specific finding on that score, returning a general verdict.

[16] Huebner's testimony, given some 14 years after the events had occurred and without the use of any records, was quite general in regard to the amounts of the payments made by Lubben; the figures were always stated in round numbers, usually preceded by a qualifying adjective.   For example, he testified that "sometime in January, 1945" he received "between ten and eleven thousand dollars" from Lubben, and that in the "first part of May of 1945" he received "approximately $30,000."   In contrast, Lubben's trial testimony was precise as to the amounts paid and was supported by various documentary evidence—invoices, vouchers, book entries, recapitulation sheets, cash authorization sheets, and checks to cash.   For example, Lubben testified that on May 3, 1945, he paid $22,124.13 to Huebner at the Sherman Hotel in Chicago; this testimony was supported by an expense voucher and a check to cash in that amount, both of which were put in evidence.

circumstances." *United States v. Johnson,* 327 U. S. 106, 111. We find none here. This is not a case, as were *Mesarosh v. United States,* 352 U. S. 1, and *Communist Party v. Subversive Activities Control Board,* 351 U. S. 115, where a conviction may be regarded or is conceded to have rested on perjured testimony.[17] To overturn the denial of a new trial in this case by the two lower courts would be tantamount to saying that any subsequently discovered inaccuracy in the testimony of an important trial witness, which might have affected his credibility in the eyes of the jury, would entitle a convicted defendant to a new trial. We cannot so hold.

## III.

Petitioners next argue that the remand proceedings were the product of fraud and other gross improprieties on the part of the Government and that they should therefore be held for naught. The contention has three aspects: (1) that the Government did not disclose to this Court that the testimony of three witnesses proffered in support of its motion to remand was contrary in some respects to that which they had given, or failed to give, on previous occasions; (2) that the Government failed to establish on remand that there had been any perjury on the part of the defense at the original suppression hearing, and itself suborned three of its remand witnesses to testify falsely; and (3) that the prosecution utilized the delay occasioned by the motion to remand (355 U. S., 236–237, note 6) to dragoon witnesses into testifying in support of

---

[17] In stating this we have not been unmindful of the fact that subsequent litigation has shown Lubben's character not to be a savory one. See *Giglio v. United States,* 355 U. S. 339; *In re Carlsen,* 17 N. J. 338, 111 A. 2d 393; *State v. Weleck,* 34 N. J. Super. 267, 112 A. 2d 23. Yet, so far as this trial is concerned, a vigorous cross-examination of him, to the tune of some 300 pages of the printed record, evidently failed to shake his credibility in the estimation of the jury.

the Government's view of things.[18]   We find no truth in any of these serious charges.

The most that could possibly be claimed respecting the absence of any reference in the remand papers to prior inconsistent statements by the proffered witnesses [19] is that it was a mistake of judgment on the part of the Government not to include such a reference.   But, without minimizing the unqualified duty of scrupulous candor that rests upon government counsel in all dealings with this Court, to characterize this episode as amounting to a fraud upon the Court is, to say the least, utterly extravagant.

The issue tendered by the motion to remand was of course not whether the Government's new evidence was true or false, but whether it warranted a reexamination of the suppression issue by the District Court.   The evaluation of this evidence, including the credibility of the three witnesses in question, was as this Court recognized (355 U. S., at 241, 244–245) a matter for the District Court.

---

[18] At the oral argument petitioners' counsel of course disclaimed any intention of implicating the then Solicitor General, and we presume the members of his staff, in these accusations of wrongdoing.

[19] The witnesses were Graflund, Shotwell's comptroller, Huebner, and Lima, a former revenue agent.   Specifically, the Government is accused of concealing the following contradictions: (1) Graflund had told government investigators and the 1956 grand jury (*infra,* pp. 360–361) that (as he had testified at the trial) he had first disclosed the black-market transactions to Busby, Shotwell's auditor, in January 1948, although his remand affidavit stated that this conversation had taken place in June 1948; (2) Huebner, prior to executing his affidavit, had not recalled having attended a meeting with Sullivan and one Urban at the Chicago Athletic Club for the purpose of discussing a purchase of Lubben's business so as to enable petitioners to get their hands on Lubben's books and records; (3) the Government's motion indicated that Lima would testify on remand that he had prepared a report showing a Shotwell deficiency of $20,000 and then destroyed it at his supervisor's direction, but it was not revealed that in his previous testimony at the trial Lima had not mentioned the preparation of such a report.

In these circumstances it is understandable that the Government might have considered that if a remand were ordered the District Court was the appropriate forum in which to make available any impeaching material in its possession. Cf., *e. g., Jencks* v. *United States,* 353 U. S. 657; *United States* v. *Zborowski,* 271 F. 2d 661. In any event the Government having fully disclosed all such material in the trial court, and that court having taken it into account in making its findings, *infra,* p. 360, it would be captious to hold that the failure to advert to it in this Court now vitiates the remand.

The claim that the remand should be set aside because no perjury was found in connection with the petitioners' original testimony relating to the disclosure both misconceives the terms of the remand and misportrays the record. Our remand did not have the narrow compass attributed to it, but broadly directed the District Court to reexamine the whole disclosure episode (355 U. S., at 245–246)—a direction to which the proceedings below were entirely responsive. And the District Court plainly found that the course and nature of the disclosure had been deliberately misrepresented by petitioners in significant respects at the earlier suppression hearing.[20] On the other

---

[20] In essence the defense position at the first suppression hearing had been (1) that a general disclosure had first been made to Sauber, the Bureau's representative, by Busby and Cain in late January 1948, some six months before the Bureau's Agent Krane had commenced an investigation of the Lubben-Shotwell transactions on June 21, 1948; (2) that pursuant to the January discussion with Sauber the disclosure figures had then been prepared over a period of several months and furnished to the Bureau in August 1948; and (3) that none of the Shotwell black-market receipts had been pocketed by any of the individual petitioners.

At the second suppression hearing the District Court found (1) that the Busby and Cain general disclosure had not been made in January 1948, but "much later" than March 15, 1948, the date testified to by Sauber in the earlier proceedings, although it was before the opening

side of the coin the District Court, after full and painstaking consideration, found that the facts, except in one particular, were as anticipatorily represented in the Government's remand papers, and that Huebner, Graflund and Lima (note 19) had testified honestly.[21] It is certainly not for us to reassess their credibility.

Finally, as to the Government's alleged dragooning of these witnesses, it appears that in connection with a new grand jury investigation that was conducted from April 1956 to February 1957 into these same black-market transactions (resulting in a further indictment against these individual petitioners and others), Graflund, Huebner, and Lima, among some 64 witnesses, were called for question-

---

of Krane's investigation on June 21, 1948; (2) that while efforts were made between January and August 1948 to get from Lubben the amounts of Shotwell's black-market receipts, the offsetting black-market supply payments were not made up until a day in July 1948 and were then "concocted 'out of thin air,'" as had been represented in the Government's motion to remand; and (3) that petitioners' denials of having personally pocketed any of the black-market receipts were false.

[21] The District Court found it "very probable" that Graflund had first talked with Busby about Shotwell's black-market receipts in January 1948, contrary to his remand affidavit (note 19, *supra*) and testimony at the second suppression hearing where he fixed the date as late June 1948. The court, however, found that Graflund had given the latter date "in good faith," and that his error was attributable to "lapse of time" and the probability that there had been such conversations in both January and June, Graflund having been led to discard the January date because of the "apparent falsity of Busby's statement that he first spoke to Sauber in January, 1948." The court further observed: "I believe Graflund is attempting now to tell the truth as he remembers the events after the lapse of these many years."

The court also believed Lima's testimony as described in the Government's motion to remand (note 19, *supra*), although it doubted whether the destroyed report was intended to represent the final disposition of the Shotwell affair. And as to Huebner, see pp. 355–356, *supra*.

ing on more than one occasion. But there is nothing in this record to indicate that these repetitive appearances were oppressive or that any of their questioning was attended by improper methods of interrogation.[22] And the District Court, after elaborate exploration, found the charges of prosecutorial overreaching baseless.[23]

We now leave the remand proceedings and turn to the only two challenges pressed here with respect to the main case itself.

## IV.

In March 1958, more than four years after the trial, petitioners filed amended motions attacking the grand and petit jury arrays. These motions, predicated on "newly discovered evidence," alleged that both juries were illegally constituted because the jury commissioner delegated his selection duties to one of his private employees; volunteers were permitted to serve on the juries; and the

---

[22] Both Huebner and Graflund testified under cross-examination by petitioners' counsel that they had not been subjected to pressure of any kind.

[23] The court said: "Defendants urge that Huebner and Graflund, concerned with possible future criminal prosecution against them by the Government, and Lima, worried about his job, have wittingly or unwittingly followed the suggestions and pattern of events which zealous government officials may have attempted to inculcate. I have endeavored to make reasonable allowances for the lapse of the years which dim memories, and to give due consideration to the claim of the defendants as to the interest of the revenue officers, and perhaps others, to encourage these witnesses to follow a chronology of events and circumstances which may support the Government's contentions as to what occurred during the years in question. However, I do not believe that any government official has attempted to have any witness herein testify falsely." And the court further observed: "The forthright attitude of government counsel to submit all prior statements and Grand Jury testimony of Huebner and Graflund to defendants' counsel indicates a commendable frankness in affording the Court all of the background which may bear upon their veracity."

Clerk of the District Court failed to employ a selection method designed to secure a cross-section of the population.

We think, as the two lower courts did, that petitioners have lost these objections by years of inaction. Rule 12 (b)(2) of the Federal Rules of Criminal Procedure provides: "Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. . . . Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver." Petitioners concede, as they must, that this Rule applies to their objection to the grand jury array,[24] but deny that it applies to their objection to the petit jury array. On the latter point we do not agree. In *Frazier* v. *United States,* 335 U. S. 497, 503, this Court stated that a challenge to the method of selecting the petit jury panel comes too late when not made before trial. And the lower federal courts have uniformly held that an objection to the petit jury array is not timely if it is first raised after verdict. See, *e. g., Hanratty* v. *United States,* 218 F. 2d 358, 359, cert. denied, 349 U. S. 928; *United States* v. *Klock,* 210 F. 2d 217, 220; *Higgins* v. *United States,* 160 F. 2d 222, 223, cert. denied, 331 U. S. 822; *United States* v. *Peterson,* 24 F. Supp. 470.

Petitioners have not advanced any reasons for overturning this settled course of decision. Rather, they argue that when public officials violate constitutional rights by actions whose illegality is not readily noticeable

---

[24] See *Scales* v. *United States,* 367 U. S. 203, 259; *United States* v. *Clancy,* 276 F. 2d 617, 631, rev'd on other grounds, 365 U. S. 312; *Miranda* v. *United States,* 255 F. 2d 9, 16.

by the litigants or their counsel, sufficient cause has been shown to warrant relief from application of the Rule. *Ballard* v. *United States,* 329 U. S. 187, is said to stand for the broad proposition that technical rules of procedure do not prevent this Court from considering the merits of a basic challenge to the method of jury selection.

In the circumstances of this case, petitioners' contentions are without foundation. In denying the motions the District Court found that the facts concerning the selection of the grand and petit juries were notorious and available to petitioners in the exercise of due diligence before the trial. The same method of selecting jurors in the district had been followed by the clerk and the jury commissioner for years. Inquiry as to the system employed could have been made at any time. Indeed, the acceptance of volunteers for the juries had received publicity in the newspapers, and their presence on the petit jury could have been ascertained at the time it was constituted. And *Ballard* lends no support to petitioners' position, for in that case the challenge to the jury panel had been timely made and preserved. See 329 U. S., at 190.

Finally, both courts below have found that petitioners were not prejudiced in any way by the alleged illegalities in the selection of the juries. Nor do petitioners point to any resulting prejudice.[25] In *Ballard* it was said (at p. 195) that "reversible error does not depend on a showing of prejudice in an individual case." However, where, as here, objection to the jury selection has not been timely raised under Rule 12 (b)(2), it is entirely proper to take absence of prejudice into account in determining whether a sufficient showing has been made to warrant relief from the effect of that Rule.

---

[25] It is not suggested that the contentions made here go to the individual qualifications of any seated grand or petit juror.

We need express no opinion on the propriety of the practices attacked. It is enough to say that we find no error in the two lower courts' holding that the objection has been lost.

## V.

Petitioner Sullivan contends that he was denied a fair trial in two respects: (1) the only specific evidence against him was an alleged admission which Lubben testified Sullivan made to him—testimony which Lubben, it is asserted, later recanted; and (2) the trial judge's instructions allowed the jury to consider evidence that had not been admitted against him.

At one point in the trial Lubben testified that, to the best of his recollection, he had a conversation with Sullivan on or about February 14, 1946, concerning the advisability of paying the black-market overages by check. According to Lubben: Sullivan asked "Are you sure this [the payment] is not appearing on your books any place?" Sullivan then proceeded to state: "Well, Dave, you know how it is. You have a place in New Jersey, a farm in New Jersey. This money I have been using in my farm. . . . I am getting a new driveway . . . put in. . . . That is the only way I can do it today, with the tax situations the way they are." When the trial resumed the following day, Lubben volunteered a correction of his previous testimony, stating that the conversation had taken place as described but not on February 14, 1946; it had occurred, he thought, "some time around September or October of 1946." It is apparent, therefore, that the substance of the testimony was not recanted.

There was, moreover, additional testimony against this petitioner. Sullivan himself admitted at the trial that he had knowledge of the Shotwell black-market receipts, maintaining, however, that the money was used solely for the purchase of black-market supplies. But Roeser,

comptroller of Shotwell, testified that, when directed, he turned over cash moneys received from Lubben to Cain, Huebner, and Sullivan. Ericson, shipping superintendent of Shotwell in 1945 and 1946, stated that although his memory was not clear as to the particular officials present when the devious method of shipping black-market candy to Lubben was inaugurated,[26] he would not have shipped in this way without instructions from Cain, Sullivan, or Huebner. And Sullivan's own answers on cross-examination respecting his knowledge of the necessity for keeping the Lubben black-market transactions off Shotwell's books were, to say the least, highly equivocal.[27]

The foregoing evidence, coupled with Sullivan's status as executive vice-president of Shotwell and his general prominence at the policy level of the company's affairs, was amply sufficient to carry the case as to him to the jury and to support its verdict of guilt.

---

[26] When shipping candy to Lubben, the name "ABC Company" was entered on the bills of lading as the shipper instead of Shotwell.

[27] "Q. Didn't you know it [Lubben payments] would have to be kept off the books or the OPA investigators would locate it?

"A. That was true after—that wasn't true after June of 1945 when the OPA went off, or am I right—1946, June 30th.

"Q. How about the period prior to that?

"A. Certainly it had to be kept off the books or you would be subject to perhaps additional trouble.. I know that now. I didn't know it then, I don't believe.

"Q. Well, are you sure?

"A. Am I sure about what?

"Q. You said you don't believe you knew it then. Are you sure you didn't know it then?

"A. I don't ever remember discussing it. I am not positive.

"Q. Of course you knew that if it was off the books for OPA purposes, it was also off the books for Internal Revenue purposes, didn't you?

"A. Not necessarily. Not necessarily."

The trial judge repeatedly cautioned the jury throughout the trial that certain evidence, particularly the disclosure documents turned over to the Treasury, was not being admitted against Sullivan and should not be considered against him. It is claimed, however, that the court's instructions nevertheless allowed the jury to consider such evidence. The allegedly erroneous portion of the charge states:

> "You have heard the testimony regarding Cain's alleged admission as to the falsity or incompleteness of these tax returns, and his explanation as to why, in his opinion, at the time he assumed they were false and inaccurate.
>
> "There has also been received in evidence work sheets and data compiled by Mr. Busby, and certain data compiled by Mr. Cain with respect to an alleged tentative compilation of the overages, and the disposition of such receipts by Shotwell, for raw materials, and the nature and character of the disposition, which was allegedly made.
>
> "All of the testimony should be considered by you, that is, all that testimony should be considered by you in view of the circumstances, and understanding of the parties in so far as it may bear upon any intent of the parties to wilfully violate the income tax laws or their good faith, or lack of good faith in the matter."

This instruction must be read in context. Shortly after it was given, the court proceeded to charge:

> "Any statement or act of any of the defendants not in the presence of another defendant is not binding upon the absent defendants, even though one or more of the defendants were mentioned in the conversation, nor are such matters competent evidence against any other defendant not present. I have

limited, you will observe, certain evidence during the trial, from time to time, as being competent only as to certain defendant or defendants, that is, by way of example, what Mr. Huebñer, or Mr. Cain may have said or done in the absence of Mr. Sullivan, would not be binding or competent as to Mr. Sullivan."

This limiting instruction is clear. It must be presumed that the jury conscientiously observed it. *United States* v. *Harris,* 211 F. 2d 656, 659, cert. denied, 348 U. S. 822. Surely it would have been impracticable for the trial judge, as he discussed the evidence in his final instructions, to have reminded the jury with respect to each of the many items of proof mentioned that it had been admitted only against certain named defendants and should not be considered against the others. We find no error in the charge.

The judgment of the Court of Appeals as to all petitioners must be

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

I think these criminal convictions should be reversed and a new trial granted because of serious errors denying the defendants the protection of two constitutional guarantees for a fair trial.

*First.* The jury verdicts rest in part on confessions obtained from the defendants by governmental promises of immunity from criminal prosecution, in violation of the Fifth Amendment.

*Second.* If the Government's chief witness on the remand hearing gave truthful testimony, the jury's conviction of the defendants rests in substantial part on false testimony of the Government's chief trial witness.

An understanding of these two questions requires a statement of the circumstances out of which they arise. The Shotwell Manufacturing Company and its principal officers were convicted in Federal District Court of willfully attempting to evade Shotwell's corporate income taxes for the years 1945 and 1946. The most damaging evidence the Government had against the defendants consisted of confessions of the individual defendants that they had failed to report certain amounts of the corporation's 1945–1946 income. The Government also offered data it obtained from the books and records of the corporate defendant after these confessions were made. At the time these confessions were given, the Treasury Department had in effect its widely publicized and proclaimed "voluntary disclosure policy," which, according to Secretary of the Treasury Vinson, promised immunity from prosecution to any tax evader, even a "willful evader," "who makes a disclosure before an investigation is under way." [1] This whole record shows beyond doubt that before any investigation of them had been initiated the defendants learned of the Treasury's promise and disclosed their failure to report income

---

[1] Hearings on Proposals for Strengthening Tax Administration before a Subcommittee of the House Committee on Ways and Means, 82d Cong., 2d Sess. 143–144 (1952) (statement of Secretary Vinson, reprinted from Washington Post, Aug. 21, 1945). Some form of voluntary disclosure policy had existed since 1919. In 1945, however, the policy took the form of a clear and direct invitation to taxpayers to come forward and disclose their tax derelictions in reliance on the Government's unequivocal promise of immunity. Hearings, *supra,* at 78–79 (Press Release of Treasury Department, Dec. 11, 1951). Secretary Vinson's statement "crystallized" the earlier practice into "definite policy," according to Turner L. Smith, Chief of Criminal Tax Section, Dept. of Justice, in an address reprinted in Section of Taxation, ABA, Symposium on Procedure in Tax Fraud Cases 29, 38–39 (1951).

with the full expectation of receiving the benefits of the promise. Moreover, they made their confessions and made the data available only after assurances of a Chief Deputy Collector that "if the disclosure [was] timely and the facts . . . related to him were correct, he saw no reason why the immunity policy of the Bureau should not be applied in this particular matter." After the defendants, solely in reliance on the policy, had voluntarily given government agents enough evidence to show a failure to report a substantial part of Shotwell's 1945–1946 income, the Government nevertheless refused the promised immunity and secured the indictments on which these prosecutions are based. Charging that the court should not permit the Government to reap advantage from broken promises but should compel it to grant the promised immunity, the defendants filed motions to dismiss the indictments. The court refused to dismiss, however, holding that since the Treasury Department's promises of immunity were not authorized by statute, the Government was not legally bound to keep these promises and could therefore break faith with its taxpayers whenever it chose to do so. Having been denied the promised immunity, the defendants then moved to suppress their confessions, the incriminating documentary evidence which they had specially prepared and delivered to Treasury agents, and all data compiled by the Treasury from books and records made available by the defendants during the time the Government was leading them to believe that they would be granted the immunity as promised. The ground for the motion to suppress was that since the confessions had been obtained by promises of immunity their use would violate the Fifth Amendment's prohibition against compelling a person to be a witness against himself. The District Court refused to suppress, but the Court of Appeals

reversed the convictions because they were based partly on the confessions and documents.[2] While the Government's application for certiorari was pending before us, the Government filed motions asking us to delay consideration of its application. The Government alleged that, since the convictions, it had obtained evidence indicating that the defendants and a government official had given perjured testimony about the timeliness and complete truthfulness of the disclosures. Later, we were asked to remand the whole case to the district judge for him to give new consideration to the motion to suppress, the grounds for this motion being that the Government had new evidence in the form of affidavits tending to show that the defendants' disclosure of their tax derelictions had neither been "timely" nor "in good faith." The Government claimed to have affidavits showing (1) the disclosures were not "timely" because they had not been made until after an investigation had been initiated by the Government and (2) the disclosures were not "in good faith" because the defendants had denied their guilt of criminal tax evasion. This Court granted the motion and remanded the case [3] over a dissent which in part took the position that the alleged new facts bore directly on the guilt or innocence of the defendants and that the defendants were entitled to have this evidence submitted to a jury instead of to a trial-judge. On remand the evidence offered by the Government before the trial judge utterly failed to support the Government's charge that the defendants were guilty of perjury in testifying that their disclosures to the Treasury Department were made before any investigation had been initiated. As to the second charge that the defendants did not act in good faith

---

[2] *United States* v. *Shotwell Mfg. Co.*, 225 F. 2d 394 (C. A. 7th Cir. 1955).

[3] 355 U. S. 233 (1957).

because they denied their guilt, the trial judge found with the Government. It is of great importance, however, that the chief government witness on remand (Huebner) testified that the chief government witness at the trial before the jury (Lubben) had lied to the jury in giving evidence which the record shows was crucial to the jury's finding of guilt. Although the district judge was compelled to find from the record that it was "entirely probable" that this government witness Lubben had "exaggerated" in giving testimony before the jury, he nevertheless reaffirmed his refusal to suppress the incriminating evidence and also denied a motion for a new trial because he thought the defendants were guilty anyway and there would therefore be no "miscarriage of justice" in denying them a new trial before a new jury to hear the new evidence. This time the Court of Appeals affirmed.[4] It is out of this situation that the two issues arise, the rights protected by the Fifth Amendment, and the right to a fair trial before a jury.

## I.

I think the Court of Appeals was wrong in affirming the refusal to suppress but was right the first time when it held that the use of these confessions induced by the Government's promise of immunity "was a violation of each defendant's privilege against being compelled in any criminal case to be a witness against himself, as guaranteed by the Fifth Amendment to the constitution of the United States." [5]

"The constitutional test for admission of an accused's confession in federal courts for a long time has been whether it was made 'freely, voluntarily and without compulsion or inducement of any sort.' " [6]   Confessions

---

[4] 287 F. 2d 667 (C. A. 7th Cir. 1961).

[5] 225 F. 2d 394, 406 (C. A. 7th Cir. 1955).

[6] *United States* v. *Carignan,* 342 U. S. 36, 41 (1951).

of guilt "are inadmissible if made under any threat, promise, or encouragement of any hope or favor." [7]   This Court's leading discussion of the admissibility of confessions, admissions, and incriminating statements both at common law and under the Fifth Amendment is contained in *Bram* v. *United States,* 168 U. S. 532 (1897).   That opinion written by Mr. Justice White traces the development of the prohibitions against the use of involuntary confessions both in England and in this country.   It concludes that in United States courts,

> "the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' " 168 U. S., at 542.

To explain what confessions are admissible under the Fifth Amendment because not "compelled," the Court quoted and adopted this passage from 3 Russell on Crimes 478 (6th ed.):

> " 'But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight . . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' "   168 U. S., at 542–543.   See, to the same effect, *Wilson* v. *United States,* 162 U. S. 613, 622 (1896).

---

[7] *Wilson* v. *United States,* 162 U. S. 613, 622 (1896).

Thus it was clearly pointed out that a "compelled" confession within the Fifth Amendment's meaning is one induced either by fear of injury or hope of reward. In order to emphasize this conclusion, the Court in *Bram,* time after time, repeated for itself or quoted with approval prior statements that confessions to be "free and voluntary" must not have been induced or influenced by "hope or fear," [8] "compulsion . . . physical or moral," [9] "threat or inducement," [10] or by "any inducement." [11] A careful reading of the *Bram* opinion can leave no doubt that a proper interpretation of the Fifth Amendment, according to that case, would prohibit the Government's use of a confession induced by a hope of immunity such as that solemnly held out by the Government here just as much as it would bar use of a confession obtained by violence or threats of violence. And no one of these statements, which the Court professes today to accept, leaves this Court with the slightest freedom to invent exceptions to the Fifth Amendment rule that confessions so induced are inadmissible. Not only has the *Bram* case been repeatedly cited with approval by this Court [12] but also

[8] 168 U. S., at 548, 549, 550, 558, 562.

[9] *Id.,* at 548.

[10] *Id.,* at 554.

[11] *Id.,* at 556.

[12] See, *e. g., Hardy* v. *United States,* 186 U. S. 224, 229 (1902); *Wan* v. *United States,* 266 U. S. 1, 15 (1924); *Lisenba* v. *California,* 314 U. S. 219, 236 n. 16 (1941); *Waley* v. *Johnston,* 316 U. S. 101, 104 (1942); *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154 n. 9 (1944); *Smith* v. *United States,* 348 U. S. 147, 150 (1954); *Gallegos* v. *Colorado,* 370 U. S. 49, 52 (1962). But see *Stein* v. *New York,* 346 U. S. 156, 190 n. 35 (1953). The general validity of *Bram* has been assumed in many other cases. See *Mapp* v. *Ohio,* 367 U. S. 643, 656–657 (1961), where the Court quoted *Bram* in stating, "We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and

its declaration that confessions are equally involuntary whether obtained by hope or fear is in harmony with the rule that has obtained in a majority of the state courts for more than a century.[13]   Indeed, it is a commonplace, known perhaps to any lawyer who has ever tried half a dozen criminal cases, that before offering a confession against a defendant a proper predicate must be laid, that is, proof that the confession was not the result of any threat or promise of reward.[14]

The continuing vitality of the Fifth Amendment's protection as defined in *Bram* was specifically recognized in *Smith* v. *United States,* 348 U. S. 147 (1954), which involved circumstances startlingly like those in this case. Smith was prosecuted for attempted tax evasion.   He contended that a confession of his should not have been admitted into evidence because he gave it on an understanding with a government agent that he would be granted immunity.   Smith's accountant testified that the agent had promised this immunity and that the data showing guilt would not have been given had these governmental promises not been made.   The trial judge submitted this issue to the jury with the instruction that it should reject the confession if "trickery, fraud or deceit" had been "practiced on petitioner or his accountant."   This Court held that on those facts the issue was properly submitted to the jury and that "the jury, in arriving at its general verdict [of guilt], could have found from the conflicting evidence

the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] . . . only after years of struggle.' "

[13] See 28 L. Ed. 262, note.   Cases collected, 20 Am. Jur., Evid., §§ 506, 511; 18 L. R. A. (N. S.) 820–824; 50 L. R. A. (N. S.) 1086–1087.

[14] It is interesting to note that in the proceedings on remand, government counsel, in calling the witness Huebner who testified as to matters that incriminated him, was eager to have Huebner state that no one connected with the Federal Government had threatened or coerced him or made him "any promises of reward or immunity."

that no fraudulent inducement had been offered petitioner or his accountant." 348 U. S., at 151. In the present case, the undisputed evidence given both by the Government's tax agent himself and by defendants' accountant was that the agent had assured the defendants that the Government's general policy of immunity would be applicable to them. The Circuit Court found as a fact that this promise was made by the government agent.[15] On remand, the District Court found it "entirely probable" that the promise had been made. The Court of Appeals in its second opinion did not disturb its earlier findings, and indeed no one, not even the Government or this Court, appears to challenge these findings. Thus, the facts proved in this case would, had they been present in the *Smith* case, have resulted in the exclusion of Smith's incriminating statement as "trickery, fraud or deceit." [16]

Although the Court purports to accept the *Bram* holding that the Fifth Amendment of itself forbids the use of a defendant's confession "obtained by any direct or implied promises, however slight," its opinion most decidedly rejects this interpretation of the Amendment. The rejection lies mainly in the Court's attempt to prove what I deem to be the unprovable, namely, that although these confessions "might not have been made in the absence of the Treasury's offer" of immunity, they nevertheless were not induced or influenced by that offer. In order to reach its astonishing conclusion, the Court uses various alternative formulas, each of which in turn lops off a significant part of the protections the Fifth Amendment has always been thought to afford.

The Court says that because the Secretary of the Treasury addressed his promise of immunity "to the public generally and not to particular individuals" the

---

[15] 225 F. 2d, at 400.

[16] Cf. *Smith* v. *O'Grady,* 312 U. S. 329 (1941).

Fifth Amendment leaves the Government wholly free to use all confessions induced by this general device. Certainly this excuse for denying the protection of the Fifth Amendment cannot be inferred either from the language of the Amendment or from anything said in the *Bram* case. It is impossible for me to understand why a confession obtained by promises addressed to the public generally is any more "voluntary" than one obtained by promises addressed to identified taxpayers known or suspected to be delinquent. Indeed, a general promise of immunity announced by a member of the President's Cabinet is likely to be far more authoritative and compelling than is an isolated promise by a subordinate official. Surely the Government cannot escape the command of the Fifth Amendment not to use government-induced confessions simply by multiplying the number of people who are promised immunity. Moreover, even if specific statements to individuals are required, the confessions in this case would still be barred by the Fifth Amendment. This is because, as has been pointed out, a Chief Deputy Collector for the Government assured the defendants' accountant that he saw no reason why their disclosures should not entitle them to immunity under the general policy.

The Court also seems to state that the Fifth Amendment does not bar the admission of confessions induced by promises of immunity unless given while under suspicion of crime in response to a specific promise by a particular officer like a policeman. There is no support for this in the *Bram* case. The Court in that case, in stating that a confession induced by a promise, however slight, was involuntary and therefore inadmissible under the Fifth Amendment, in no way intimated that the fact of involuntariness depends upon the presence of a policeman or upon any circumstance other than that a promise has been made which induced a confession. It seems to me

that a taxpayer, uneasy about possible criminal prosecution and worried about its destructive effect on his family, reputation, and business, would be susceptible to an official promise of immunity just as any other person fearful of prosecution for some other offense.[17] And if independent coercive circumstances—like the presence of a policeman, with or without club—are necessary to bar the use of a confession, as the Court indicates, then the Court is denying that a promise by itself, no matter how authoritative, can ever result in a compelled confession prohibited by the Fifth Amendment.

The Court concludes that "the voluntary disclosure policy left [petitioners] wholly free to disclose or not as they pleased. In choosing to act as they did, petitioners, far from being the victims of that policy, were volunteers for its benefits." Labeling petitioners as "volunteers" proves nothing. Of course they were "volunteers." It was to get "volunteers" that the Government established the policy. Petitioners learned that their Government had promised immunity for disclosures and they volunteered to make them because of that promise. But petitioners' confessions are no more "voluntary"—in the sense of not being induced by a promise—than those of suspects who choose to accept the benefits of a policeman's promise of immunity rather than to run the risk of being convicted on independently secured evidence. The Court's interpretation of the Fifth Amendment as permitting the use of confessions obtained by promises because those who relied on the promises were "volunteers" effectively scuttles the protection of that Amendment.

---

[17] According to the Chief Deputy Collector's testimony, one of the defendants in this case was particularly worried about the publicity that would attend a criminal case because he had two boys in school. It was at this point that the Collector assured him that this was a civil case and "he had nothing to worry about so far as publicity was concerned."

While the Court uses language which purports to give the same full scope that *Bram* did to "jealously guarded constitutional principles" of the Fifth Amendment, it is with regret that I am compelled to say that I think the Court promises more than it performs. The Court treats the cases of *Rogers* v. *Richmond,* 365 U. S. 534 (1961), and *Bram* v. *United States, supra,* as if both were rested on the Fifth Amendment. *Rogers,* however, related to a confession used in a state court, the admissibility of which depended on the Due Process Clause of the Fourteenth Amendment. While some of us believe that the Due Process Clause made the Fifth Amendment applicable to the States, *Rogers* was obviously written on the premise that the Due Process Clause forbids the use of confessions only if the circumstances under which they are used are so offensive or unreasonable as to "shock the conscience" or offend "civilized standards of decency." [18] *Bram,* on the other hand, rested exclusively on an interpretation of the Fifth Amendment's specific language forbidding the Government to compel a defendant to be a witness against himself. This distinction is important because the more precise words of the Fifth Amendment as construed in *Bram* are a far more certain safeguard against the use of compelled confessions than the tractable and pliable protections which the Court may or may not afford under the due process "shock the conscience" test. The Fifth Amendment, as construed in *Bram* and as recognized in *Smith* v. *United States, supra,* forbids the use of confessions obtained by governmental promises of immunity on the theory that such promises alone render

[18] Cf. *Reid* v. *Covert,* 354 U. S. 1, 41, 44, 65, 77 (1957) (concurring opinions); *Rochin* v. *California,* 342 U. S. 165, 169 (1952); *Adamson* v. *California,* 332 U. S. 46, 59, 67–68 (1947) (concurring opinion). But cf. *Mapp* v. *Ohio,* 367 U. S. 643, 661, 666 (1961) (concurring opinion); *Kinsella* v. *United States ex rel. Singleton,* 361 U. S. 234, 246–247 (1960).

confessions involuntary without requiring the presence of any other coercive circumstances.[19]   Moreover, if the admissibility of the confession is to be measured by standards of decency it is difficult to reconcile with those standards a holding that the Constitution forbids the Government to use a confession induced by the promise of a police officer or other subordinate agent but that it is wholly permissible to use a confession induced by the Secretary of the Treasury, one of the highest-ranking men in the Government. I cannot deny that such a standard for governmental conduct shocks my conscience.   This is particularly true when I consider the nature of the assurances solemnly given to delinquent taxpayers by Secretary of the Treasury Fred M. Vinson, who later became Chief Justice of the United States.   He said that the

> "man who makes a disclosure before an investigation is under way protects himself and his family from the stigma of a felony conviction.   And there is nothing complicated about going to a collector or other revenue officer and simply saying, 'There is something wrong with my return and I want to straighten it out.'" [20]

This simple description of all the taxpayer had to do to save himself and his family from the stigma of a prosecution is no longer recognizable in the *ex post facto* quagmire of complicated restrictions and conditions created by the Court today.

Another theory of the Court, which also departs from the *Bram* case, seems to be that there was a constructive withdrawal of the promised immunity because of the

---

[19] Similarly there can be no question of "balancing" Fifth Amendment rights against any kind of "competing interests."   See Frantz, "The First Amendment in the Balance," 71 Yale L. J. 1424, 1436–1437 (1962).

[20] Hearings, *supra* note 1, at 144.

Court's findings that the defendants failed to comply with the promise's condition of complete truthfulness. With this legal fiction as a premise, the Court moves inexorably to the conclusion that the confessions were not induced by any promise to the defendants. Nothing that I can find in the record after a careful reading furnishes a basis for the most attenuated inference that these defendants would have come forward and disclosed any tax derelictions had the Government not announced its voluntary disclosure policy and made it clear that these particular defendants could expect its benefits. The Court is here departing from the proper test as laid down in *Bram* for determining whether a disclosure is induced by a governmental promise. It was there said that a person is "involuntarily impelled to make a statement, when but for the improper influences he would have remained silent." 168 U. S., at 549. But for the immunity promised to the defendants in this case, it is inconceivable that they would have volunteered evidence upon which they could be tried and perhaps convicted of tax evasion. Moreover, every promise held out by the Government is intended to be conditioned on full and truthful disclosure. The majority's rule would require that any confession obtained by a governmental promise be admitted if it contains something less than the whole truth.

What the Court is in fact holding here is that the defendants should be denied their right to have their confessions excluded because while the confessions were in part truthful they were not truthful as a whole.[21] This Court has held under the Due Process Clause of the Four-

---

[21] Nowhere is this made more clear than in the Government's argument in its brief, in effect adopted by the Court, that
"it is inconceivable . . . that the rule barring the use of involuntary confessions should operate to exclude a declaration in which damaging admissions are inextricably intertwined with false self-serving exculpatory statements . . . ." Brief for the United States, p. 42.

teenth Amendment that a confession's truth or falsity is not relevant to the question of its admissibility.[22] I do not believe the Court should adopt a new Fifth Amendment shrinking device under which a defendant's lack of "good faith" and failure to be 100% truthful in his induced confession works a forfeiture of his Fifth Amendment rights. Probably few confessions in criminal cases are ever wholly truthful. Even a cursory examination of such cases in this and other countries would show that defendants who confess nearly always lay all the blame possible on someone else or in some way seek to justify their conduct in whole or in part.[23] Certainly this Court could not, consistently with its prior cases, hold admissible a confession obtained by a promise or threat from a person who confessed that he had assaulted another but falsely and fraudulently claimed that he had done so in self-defense. Nor could it admit the confession of a person suspected of receiving stolen goods who, after beatings, admitted possession of the goods but falsely claimed he did not know they were stolen. Yet, by the majority's view here, such compelled confessions will be admissible because, being partly false, they are "fraudulent," not made in "good faith." This is the first time, to my knowl-

---

[22] *Rogers* v. *Richmond,* 365 U. S. 534, 543–545 (1961). See *Blackburn* v. *Alabama,* 361 U. S. 199, 206 (1960); *Spano* v. *New York,* 360 U. S. 315, 324 (1959); *Payne* v. *Arkansas,* 356 U. S. 560, 567–568 (1958); cf. *Lee* v. *Mississippi,* 332 U. S. 742, 745–746 (1948); *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152 n. 7 (1944); *White* v. *Texas,* 310 U. S. 530, 531–532 (1940). While these cases were state cases decided under the Fourteenth Amendment, the Fifth Amendment's specific prohibition against the use of compelled testimony should certainly be no less comprehensive than the bar against a State's use of such testimony under the Fourteenth.

Compare *Mapp* v. *Ohio,* 367 U. S. 643, 656 (1961) (search and seizure).

[23] See, for example, the confession in *Reck* v. *Pate,* 367 U. S. 433, 438 (1961).

edge, that a defendant's constitutional right not to be compelled to be a witness against himself has ever been conditioned on his failure to come into court with "clean hands." I cannot agree to this new doctrine that a compelled confession can be admitted because partly untruthful. Such a step backwards is particularly dangerous because of the ease with which this case can be extended to admit confessions obtained not by physical violence or threats of violence but by more "civilized" techniques of compulsion, which we have characterized as inherently coercive [24]—techniques of physical exhaustion, psychological pressure, trickery, promises of leniency, and the like which sometimes subtly but always certainly undermine an accused's freedom to confess or not, as he chooses.[25]

To my way of thinking, it is the Court itself, instead of the defendants, which turns "an important constitutional principle upside down." It does this by permitting the Government to prove its case with confessions obtained by solemn promises of immunity on the theory that the confessions were not given in "good faith" and were therefore fraudulent. This conclusion is based on a finding that, while the defendants confessed a failure to report income, they falsely stated at the same time that their receipts were offset by business expenditures. In short, the Court believes that the defendants are guilty of the tax evasion charged and therefore have forfeited their Fifth Amendment rights. I cannot agree that the Court is right in making the admissibility of the confessions turn on the guilt or innocence of the defendants. The denial of the benefits of the Fifth Amendment on the Court's

---

[24] See *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154 (1944).

[25] See, *e. g., Chambers* v. *Florida,* 309 U. S. 227 (1940); *Haley* v. *Ohio,* 332 U. S. 596 (1948); *Leyra* v. *Denno,* 347 U. S. 556 (1954); *Fikes* v. *Alabama,* 352 U. S. 191 (1957); *Spano* v. *New York,* 360 U. S. 315 (1959); *Blackburn* v. *Alabama,* 361 U. S. 199 (1960); *Gallegos* v. *Colorado,* 370 U. S. 49 (1962).

belief that the defendants are guilty is a high price to pay for a conviction and a new, dangerous inroad on the protections of that Amendment. But if this is to be the standard, then I can see no escape from the conclusion that the admissibility of the confessions should ultimately be determined by a jury—not by the judges of this or any other court.[26] Moreover, if it be assumed that the Court is correct in concluding that these defendants have been guilty of fraud or perjury in their confessions, then under normal ideas of due process the proper procedure would be to indict them on these charges and let them be tried. But this Court should not use its judgment of the defendants' guilt of any crimes as an excuse for depriving them of the constitutional guarantees of the Bill of Rights.

Whatever the Court's reasons for affirming this judgment, it is plain that *Smith* v. *United States, supra,* has been undermined, the *Bram* case has been practically repudiated, and, worse still, the Fifth Amendment's prohibition against involuntary confessions has become far less of a constitutional protection than it ever was before. There is no basis in the Amendment itself for reducing its scope as the Court does today, and no precedent, weak or strong, old or new, can be found to support it. It is this Court's own invention. This Court alone therefore, this 14th day of January 1963, is entitled to whatever credit is due for enfeebling our Bill of Rights in this way. It earns that credit by ignoring the wise and solemn warning given in *Boyd* v. *United States,* 116 U. S. 616, 635 (1886):

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and uncon-

---

[26] I have previously expressed the view, to which I adhere, that the admissibility of all confessions should be a jury question. *United States* v. *Shotwell Mfg. Co.,* 355 U. S. 233, 246, 248–250 (1957) (dissenting opinion).

stitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

To construe the Fifth Amendment's prohibition against the use of compelled testimony as not protecting these confessions induced by promises of immunity is certainly no liberal construction of that part of our Bill of Rights. I cannot agree to this holding because I still believe that constitutional provisions designed to protect individual liberty from oppressive procedural tactics by government should be liberally construed in order to prevent their erosion and obliteration by insidious Legislative, Executive, and Judicial encroachments.[27] The Court's holding today will probably give great aid and comfort to many earnest people who sincerely believe that this provision of the Fifth Amendment against the use of government-induced confessions is an unworthy barnacle on the law, a sixteenth century strait jacket, which should be removed as an outworn technicality of a bygone age. Even if this is a sound view, which I do not believe, it should not be put into effect by judicial decisions like this gradually narrowing the protective scope of that Amend-

[27] See *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951); *Gouled* v. *United States,* 255 U. S. 298, 303–304 (1921); *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892).

ment but only by the constitutionally ordained amending process so that the people of this Nation can determine for themselves whether they wish to abandon this part of their heritage of freedom.

## II.

Since the record now contains new testimony offered by the Government on remand which thoroughly discredits the Government's main trial witness upon whose testimony the jury's verdict of guilty in large part rested, the defendants are being denied their constitutional right to a fair jury trial by the failure to grant them a new trial before a new jury which can hear this new evidence in determining their guilt or innocence.

This extraordinary situation arises out of the following circumstances:

Shotwell Manufacturing Company was in the candy business. During the O. P. A. days it sold candy at over-the-ceiling prices to companies wholly or in part operated by one Lubben. Shotwell did not report as income the amount by which the price it received exceeded the O. P. A. ceiling. The defendants claimed in their confessions and at their trial that they had to make these over-ceiling charges for candy to compensate for over-ceiling prices they paid for corn used in making corn syrup and other by-products necessary to the operation of their candy factory. The defendants' defense, therefore, was that all the overages paid to Shotwell by Lubben and his companies were paid out by Shotwell for raw corn and that, since the unreported income was virtually offset by unreported expenses, they were not guilty of the tax violations charged. The trial judge agreed with this view of the law and charged the jury that defendants were not guilty if the unreported income from candy was offset by unreported expenditures for corn. The crucial ques-

tions for the jury to determine, therefore, were how much money was paid by Lubben for candy and how much was paid by Shotwell for corn. The Government relied chiefly on the testimony and records of Lubben himself to show how much he had paid Shotwell. Thus, Lubben's truthfulness was a vital issue for the jury to consider. The prosecutor in addressing the jury vouched for the reliability of Lubben as an "honest, honorable American citizen," [28] the trial judge in passing sentence stated that he believed Lubben was telling the truth and that the 12 jurors had believed Lubben, and most importantly, it is clear that Lubben's testimony before the jury was significant and weighty evidence tending to peg the overpayments to Shotwell at a high level—well above the amount defendants claimed they received—and thus buttress a jury finding that more over-ceiling money was paid in for candy than went out for corn.

When this case was brought here the first time by the Government to secure reversal of the Court of Appeals holding that the Fifth Amendment rights of the defendants had been violated, the case was remanded because the Government presented "new evidence" in the form of affidavits which tended to show that the individual defendants had given perjurious testimony at the suppression hearing. [29] The District Court was instructed to hold new hearings and to make new findings of fact on the timeliness of the defendants' disclosure of unreported income and on the "good faith" of the defendants in so disclosing.

---

[28] "I will tell you who David Lubben is. He is an honest, honorable American citizen, who is down here doing his duty, just the way you people are doing your duty." This is in marked contrast to a government prosecutor's argument to the jury in another case, where he said that Lubben was "a perjurer and a black marketeer and practically anything else you want to talk about." R. 2589, *Giglio* v. *United States,* 355 U. S. 339 (1958).

[29] 355 U. S. 233 (1957).

At these hearings on remand, the Government's star witness was one Huebner, a former Shotwell officer, who was supposed to have received most of the payments made to Shotwell by Lubben. Huebner testified that he thought Lubben had "lied on the stand" at the trial before the jury. Specifically, he stated that when Lubben recounted an instance in which he had paid one Shotwell officer $49,000, "it was a mistake on Lubben's part," that the officer had never received $49,000. Again, Huebner testified that no overages had been paid on some chocolate-covered nuts on which Lubben had claimed to have paid "in the neighborhood of $40,000." Huebner also testified, and there is other evidence in the record tending to show,[30] that one Tobias said he had helped Lubben doctor his books which were used against the defendants at the trial. In his written opinion, at the conclusion of the hearing, the judge admitted:

> ". . . that Lubben may have exaggerated the amounts of the payments that he and his confederates made to Shotwell is entirely probable."

Although the judge made this finding, as the record compelled him to find, he nevertheless refused to grant the defendants a new trial before a new jury because he believed the other evidence proved the defendants guilty and that there had therefore been no "miscarriage of justice."

The effect of this action by the judge was to deny the defendants the right to have their guilt or innocence determined by a jury from all the evidence, including this new evidence discovered by the Government itself which so seriously impeaches the credibility of the main witness upon whose testimony the jury's verdicts of guilty rested. Those verdicts have now been shown to be tainted, some-

---

[30] R. 2556–2557, 2678–2679.

what like the verdict in *Mesarosh* v. *United States,* 352 U. S. 1 (1956). While that case was pending here on certiorari, the Government called our attention to the fact that one of the seven witnesses who had testified against the defendants had lied in other proceedings subsequent to the defendants' convictions. The Government insisted, however, that the witness' testimony had been truthful in its case and on that basis objected to the granting of a new trial but recommended a remand to the trial judge to determine whether the witness had in fact been truthful. We rejected that recommendation and held that the new evidence which undermined the credibility of the witness and which was produced by the Government itself required a new trial because the defendants' trial had become fatally tainted by these new disclosures. In the present case, after the defendants had been convicted, the Government came forward with evidence tending to show not merely that one among many witnesses but that its major witness had lied, not in other proceedings but on the central and determinative issue in this very case. Moreover, unlike *Mesarosh,* we have here an acknowledgment by the district judge that the testimony Lubben gave to the jury was probably exaggerated. In another case involving a charge by the defendants that it had discovered that the Government's witnesses were completely untrustworthy and should be accorded no credence, this Court remanded on these mere allegations in order to assure "findings upon untainted evidence," and said:

> "The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. See *McNabb* v. *United States,* 318 U. S. 332. Therefore, fastidious regard for the honor of the administration

of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." *Communist Party of the United States v. Subversive Activities Control Board,* 351 U. S. 115, 124 (1956). Compare *Mooney* v. *Holohan,* 294 U. S. 103 (1935).

I fear that the Court does not manifest that same "fastidious regard for the honor of the administration of justice" when it holds today that the defendants are not entitled to a new trial even though there are strong, compelling reasons to believe that the jury in this case did not base its guilty "findings upon untainted evidence."

It is true that in refusing to order a new trial when this point was argued to it, the Court of Appeals stated that it could not say that the district judge's observation that Lubben had exaggerated amounted to a charge of perjury.[31] And this Court likewise puts emphasis on the conclusion that there was no actual finding of perjury. But whether Lubben originally testified before the jury as a willful and deliberate perjurer or whether he somehow just inadvertently "exaggerated" the amounts he claimed to have paid these defendants, the effect on the jury was the same. No human being, not even the trial judge, is capable of saying that this jury would have convicted these defendants had Lubben sworn the whole truth when the jury listened to him. Moreover, in *Mesarosh* the Solicitor General conceded only that he believed that a witness against defendants had given testimony in other proceedings that was "untrue." There was no evidence that the witness had committed perjury, and the Solicitor General specifically refused to concede that he had. This Court nevertheless held that the witness' testimony was tainted because it was untruthful, and it

[31] 287 F. 2d 667, 675 (C. A. 7th Cir. 1961).

set the convictions aside so that the defendants could get a new trial.[32] The Court here is therefore wrong in stating that the *Mesarosh* "conviction may be regarded or is conceded to have rested on perjured testimony." The Court, as I see it, is simply refusing to follow *Mesarosh* without saying why.

In refusing to remand this case for a new trial, the Court of Appeals relied on its conclusion that there was enough other innocent evidence in the record to support the conviction and on its observation that credibility of Lubben was a question for the jury.[33] As stated earlier, the district judge also had denied a new trial because he was satisfied that the other evidence showed that the defendants were guilty. But again, we have held that "it does not remove the taint for a reviewing court to find that there is ample innocent testimony to support the . . . findings." [34] Further, in *Mesarosh* we said, "The district judge is not the proper agency to determine that there was sufficient evidence at the trial, other than that given by Mazzei, to sustain a conviction of any of the petitioners. Only the jury can determine what it would do on a different body of evidence, and the jury can no longer act in this case." [35] For this reason a new trial was ordered. A new trial is necessary in this case at which a jury will be privileged to hear all the relevant testimony and will be free to determine from an honest record whether these defendants are guilty. It advances nothing to say, as the Court of Appeals said, that credibility is for the jury. In this case, the new evidence offered by the government witness conclusively demonstrates that even the jury could

---

[32] 352 U. S., at 9–12.

[33] 287 F. 2d., at 675.

[34] *Communist Party of the United States* v. *Subversive Activities Control Board*, 351 U. S. 115, 124 (1956).

[35] 352 U. S., at 12.

not properly weigh credibility at the time of the trial because these damaging sworn accusations against Lubben did not exist at that time.

Proper respect for the fairness and integrity of our judicial system demands that these defendants not be allowed to stand convicted upon a record containing evidence, the truthfulness of which has now been so thoroughly discredited. Neither the District Court, the Court of Appeals, nor this Court should usurp the constitutional function of the jury to determine the guilt or innocence of these defendants on untainted evidence. There is only one way the defendants can be given the constitutional rights that have been denied them in this case, and that is to reverse the case and remand for a new jury trial.

Moreover, by granting a new trial the Court would not only assure defendants the fair trial to which they are entitled but would also make it unnecessary for the Court to reach the important, grave, and difficult Fifth Amendment questions [36] discussed in Part I of this opinion. The general rule of this Court is to avoid reaching such constitutional issues when a case can be fairly disposed of on alternative grounds.[37] Although I have sometimes thought the rule has been carried to "a wholly unjustifiable extreme," [38] this case, it seems to me, offers to the strong adherents of that rule an ideal occasion for its application in the interests of justice, which would require that a new trial be granted.

[36] See *United States* v. *Shotwell Mfg. Co.*, 355 U. S. 233, 246, 247 (1957) (dissenting opinion).

[37] *E. g., Communist Party, U. S. A.,* v. *Catherwood,* 367 U. S. 389, 392–395 (1961); *United States* v. *International Union United Automobile Workers,* 352 U. S. 567, 589–592 (1957). See also *Mapp* v. *Ohio,* 367 U. S. 643, 672, 675–677 (1961) (dissenting opinion).

[38] *Clay* v. *Sun Ins. Office Ltd.,* 363 U. S. 207, 213 (1960) (dissenting opinion).