**UNITED STATES of America, Appellant,**

v.

**James TENZER, Defendant–Appellee.**

**No. 1824, Docket 96–1653.**

United States Court of Appeals,
Second Circuit.

Sept. 19, 1997.

Ira M. Feinberg, Asst. U.S. Atty. for the Southern District of New York, New York City (Mary Jo White, U.S. Atty. for the Southern District of New York, Cynthia Keeffe Dunne, Peter G. Neiman, Asst. U.S. Atty.s, of counsel), for Appellant.

William B. Wachtel, Gold & Wachtel, LLP, New York City (Elliot Silverman, Gold & Wachtel, LLP, New York City Mortimer M. Caplin, Caplin & Drysdale, Chartered, Washington, DC, of counsel), for Defendant–Appellee.

(Michael R. Young, Stacey E. Paradise, ·Willkie Farr & Gallagher, New York City, Richard I. Miller, General Counsel, American Institute of Certified Public Accountants, New York City, of counsel), for Amicus Curiae American Institute of Certified Public Accountants.

(Robert S. Fink, Kostelanetz & Fink LLP, New York City, of counsel), for Amici Curiae New York County Lawyers' Association and New York State Society of Certified Public Accountants.

Before: MINER and McLAUGHLIN, Circuit Judges, and NICKERSON, District Judge.*

MINER, Circuit Judge:

Appeal from an order of the United States District Court for the Southern District of New York (Brieant, J.) dismissing a four-count Information charging defendant with willful failure to file income tax returns, in violation of 26 U.S.C. § 7203. The court found that the IRS had violated its own policy by recommending criminal prosecution

of one who voluntarily disclosed his failure to file and who thereafter filed the delinquent returns and made an offer in compromise of his tax liability. The district court found that this policy violation constituted a denial of due process.

For the reasons that follow, we reverse and remand to the district court.

## BACKGROUND

Defendant-appellee James Tenzer is an experienced tax attorney and accountant. At all relevant times, he was a principal of the Long Island, New York, accounting firm of Margolin Winer & Evens ("MWE") and head of its tax department. It is undisputed that Tenzer failed to timely file income tax returns for the years 1987 through 1990, or pay any taxes for those years.

During 1988, 1989 and 1990, the IRS sent Tenzer computer-generated notices regarding his failure to make the required tax filings. Tenzer repeatedly ignored these notices. In March of 1991, Tenzer retained a tax attorney, Steven Solomon, to assist him in filing his returns but did not immediately contact the IRS or file any returns. Tenzer continued to receive computer-generated notices of his failure to file from the IRS. By letter dated October 7, 1991, the IRS notified Tenzer and his wife that, due to their failure to respond, their accounts had been referred for "enforcement action," meaning civil or administrative enforcement. Tenzer was warned that enforcement action could be avoided by calling the IRS immediately or filing all delinquent returns within ten days.

Following receipt of the October 7 letter, Solomon's partner, Myron Weinberg, twice called the IRS to request an extension of time to file Tenzer's returns for 1986 through 1989. He first requested an extension until November 18, 1991, and, November 15, 1991, he requested an additional extension until December 14, 1991. However, Tenzer's returns were not filed by December 14, 1991. The IRS subsequently designated Tenzer's case for investigation and enforcement.

---

* The Honorable Eugene H. Nickerson of the United States District Court for the Eastern District of New York, sitting by designation.

On February 10, 1992, Tenzer filed his returns for 1986 through 1989. However, no payment accompanied these returns, nor did Tenzer at that time file his then-delinquent 1990 return.

### I. Civil Collection Efforts

In September of 1992, collection of Tenzer's tax deficiency was assigned to Revenue Officer Elizabeth Kishlansky, a civil collection officer. On October 15, 1992, she met with Weinberg at Solomon's office and demanded full payment of the taxes. Weinberg stated that Tenzer was unable to pay in full and wanted to enter into an installment agreement.

On October 22, 1992, Kishlansky reviewed an IRS transcript of Tenzer's account and learned that Tenzer had not filed returns for 1990 and 1991. Kishlansky telephoned Weinberg's office and left a message demanding that Tenzer file his 1990 and 1991 returns if he wanted the IRS to consider an installment agreement. Kishlansky and Weinberg spoke the next day. Kishlansky explained the IRS's policy of not agreeing to an installment plan with a taxpayer for any given year's tax liability when that taxpayer is delinquent in filing for other tax years. Kishlansky said that Tenzer must file his 1990 and 1991 returns by November 30, 1992 if he wanted to be considered for an installment agreement.

Tenzer filed his delinquent 1990 and 1991 returns on November 13, 1992. On January 8, 1993, after all the relevant returns had been filed, Kishlansky met with Weinberg, Solomon, and a new lawyer for Tenzer, Ernest Honecker, who formerly had been a high-ranking attorney with the IRS. According to the district court, Honecker asked Kishlansky at this meeting for assurances that Tenzer's voluntary disclosure was being handled as a civil matter, and was assured by Kishlansky that it was a civil matter and that she was there only for collection. At this meeting, Tenzer's attorneys first informed Kishlansky that Tenzer intended to make an "offer in compromise," that is, an offer of partial payment in settlement of Tenzer's outstanding tax liabilities instead of full payment over time through an installment

agreement. Kishlansky advised the attorneys that the IRS would not consider such a compromise settlement unless Tenzer started to become current on accruing taxes and make all required estimated tax payments. She also advised that any offer would have to be substantial. Tenzer's attorneys indicated that the offer would be approximately $250,000. Kishlansky responded by estimating that, given Tenzer's assets and potential earnings, a reasonable offer would be in excess of $600,000. Following the meeting, and after reviewing a financial statement provided by Tenzer at the meeting, Kishlansky called Weinberg and demanded that Tenzer divest himself of several assets and begin making monthly payments of $7,000 toward his tax liability. Tenzer never made any monthly payments.

By letter dated February 5, 1993, Honecker submitted on behalf of Tenzer a formal offer in compromise in the amount of $250,000. At that time, Tenzer's total tax liability was approximately $1.3 million. Enclosed with the offer was a $5,000 check· payable to the IRS, which represented the first payment under the offer terms, with $245,000 to follow within 30 days of acceptance of the offer. The financial statement that accompanied the offer showed that Tenzer's equity in assets was $345,300. The IRS subsequently returned the check and rejected the offer as being "unprocessable" because it was below the minimum amount. The letter of rejection explained that "for offers based on inability to pay, you must generally offer an amount equal to or in excess of the amount shown as 'equity in assets' on your financial statement(s)."

On April 14, 1993, Honecker responded with a letter to the IRS arguing that the IRS should accept the offer. Honecker explained that, in arriving at the offer amount of $250,000, consideration had been given to the forced sale value of non-liquid items such as real estate and Tenzer's partnership interests. Quoting the IRS Manual, he urged that it was appropriate to use the forced sale value of assets in determining Tenzer's collection potential. Honecker also noted that he intended to resubmit the offer with an explanation attached to the financial state-

ment of how he arrived at the forced sale value of certain assets. Additionally, because Tenzer had made estimated payments on his 1993 federal and state income taxes, Honecker wrote that some of Tenzer's liquid assets had declined in value and therefore a new financial statement would be prepared.

During these negotiations with the IRS, Tenzer failed to become current on his accruing tax liabilities. He paid no estimated taxes during 1992, and, although he timely filed his 1992 return, he failed to pay any of the $135,665 tax due for that year.

Kishlansky and her supervisor concluded that Tenzer was not attempting in good faith to pay his taxes, but rather was engaged in stalling tactics. In late April of 1993, Tenzer's file was transferred to the IRS's office in Brooklyn, the office for the region in which most of Tenzer's assets were located, for further collection. According to Honecker, Kishlansky informed him of the transfer and instructed him to forego resubmission of his offer until he had been contacted by a revenue officer from the Brooklyn office.

Honecker testified that although he had prepared the offer for resubmission, the Brooklyn office never contacted him. Instead, he was informed by a special agent, in late June or early July of 1993, that Tenzer was under criminal investigation by the IRS. Honecker allegedly asked the agent if the Brooklyn office had not contacted him because a freeze had been placed on the collection action in light of the criminal investigation, and the special agent answered in the affirmative. Apparently, the special agent had notified a civil collections officer earlier that month not to take any further action on Tenzer's case due to the pending freeze.

## II. Criminal Investigation and Prosecution

In July of 1991, MWE was notified by one of Tenzer's clients, JRD Management Corp. ("JRD"), a real estate management firm, that JRD had been served with a grand jury subpoena seeking its records in a criminal tax investigation. On November 22, 1991, in connection with that investigation, MWE also was served with a grand jury subpoena requiring production of documents relating to JRD.

The government, believing that Tenzer might have been involved in some fraudulent activity, sought authorization to include him in its investigation of JRD. In June of 1993, while gathering information to support this request, government agents discovered that Tenzer himself had failed for years to timely file his tax returns. The U.S. Attorney's Office accordingly requested and received authorization from the IRS to investigate Tenzer both for his role in the JRD fraud case and for offenses relating to Tenzer's personal taxes, including failure to timely file. On June 23, 1993, the IRS placed the freeze on Tenzer's case, and, on July 9, 1993, Tenzer was notified that he was the subject of a criminal investigation into his personal returns.

On November 15, 1994, the IRS forwarded to the tax division of the Justice Department a recommendation that Tenzer be prosecuted. Tenzer's attorneys attended a meeting at the Justice Department in Washington, D.C. approximately two months later. They there argued that Tenzer should not be prosecuted because of his compliance with the voluntary disclosure policy. On March 27, 1995, the Justice Department authorized Tenzer's prosecution and, on November 30, 1995, Tenzer was charged in a four-count Information. The Information charged him with having unlawfully, willingly and knowingly failed to file income tax returns for 1987, 1988, 1989, and 1990.

On March 4, 1996, Tenzer filed a motion to dismiss the Information. He claimed that he had satisfied the requirements of the IRS's voluntary disclosure policy, and that the IRS—in recommending prosecution—had failed to follow its own policy, thereby violating his due process rights. In the alternative, Tenzer argued that the returns and any resulting evidence should be suppressed because they were produced in reliance upon the IRS's alleged promise of immunity from prosecution. Tenzer also argued that Count One, relating to his 1987 return, was barred by the statute of limitations.

The district court held a four-day evidentiary hearing in April of 1996. During that hearing, Tenzer first asserted that his prose-

cution for failing to file his 1990 return also was barred by the IRS's non-solicitation policy.

On September 10, 1996, the district court granted Tenzer's motion and ordered the Information dismissed on the ground that Tenzer had satisfied the IRS's voluntary disclosure policy and therefore was immune from prosecution. The district court also determined that Tenzer's 1990 return had been solicited by Kishlansky and that this provided an independent basis for dismissal of Count Four of the Information, which related to the 1990 tax year. This appeal followed.

## DISCUSSION

### I. Tenzer's Compliance with the Voluntary Disclosure Policy

The government argues that the district court erred in determining that Tenzer satisfied the IRS's voluntary disclosure policy. We agree.[1]

#### A. The Voluntary Disclosure Policy

The IRS's voluntary disclosure policy has been in existence, in one form or another, since 1952. Prior to 1952, the Treasury Department applied a voluntary disclosure policy which "presupposed, at the very least, that a delinquent taxpayer would make a full 'clean breast of things.'" *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 349, 83 S.Ct. 448, 454, 9 L.Ed.2d 357 (1963) (quoting *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 235, 78 S.Ct. 245, 247, 2 L.Ed.2d 234 (1957)). The Supreme Court described this earlier version of the voluntary disclosure policy as an "offer of immunity." *Id.* at 350, 83 S.Ct. at 454.

On January 10, 1952, the Treasury Department announced that it was abandoning its former policy. The Department explained that "[i]t is the policy of the Treasury Department to recommend criminal prosecution in every case where the facts and circumstances warrant that action." Treas. Decl.

S–2930 (Jan. 10, 1952). The IRS issued a statement in 1961 reaffirming the 1952 position, stating that "even true voluntary disclosure of a willful violation will not, of itself, guarantee prosecution immunity. At the same time, the Service will carefully consider and weigh it, along with all other facts and circumstances, in deciding whether or not to recommend prosecution." I.R.S. News Release IR–432 (Dec. 13, 1961). This policy was written into the Internal Revenue Manual ("IRM") in 1973. The relevant IRM provision stated that a voluntary disclosure may be "significant" in the IRS's decision whether to recommend prosecution, but "does not necessarily preclude prosecution." IRM § P–9–2 (Jan. 19, 1973).

The voluntary disclosure policy was amended several times over the years. However, all versions had in common the requirement that, in order to be eligible for the benefits of the policy, the taxpayer must either pay or make bona fide arrangements to pay the applicable taxes and penalties. *See, e.g.,* IRM § 342.142(3)(e) (Apr. 5, 1993) (requiring that the taxpayer have "[e]ither made full payment of the amounts due or in those situations where the taxpayer was unable to make full payment, made bona fide arrangements to pay"); IRS Chief Counsel's Directives Manual ("CCDM") § (31)330(4)(d) (Dec. 12, 1991) ("The taxpayer must make bona fide arrangements to pay the applicable taxes and penalties to the extent of the taxpayer's actual ability to pay.").

#### B. Tenzer's Compliance

■ The parties vigorously dispute which version of the voluntary disclosure policy applies. We need not decide this question, nor the related question of whether Tenzer's disclosure was timely, because we find that Tenzer failed either to pay his taxes or to make bona fide arrangements to pay. Thus, irrespective of which version of the policy is applicable, Tenzer has not satisfied the voluntary disclosure policy.

---

1. The government also disputes the district court's determination that the IRS's decision to prosecute Tenzer violated his due process rights. Because we conclude that the district court erred in finding that Tenzer complied with the voluntary disclosure policy, we find it unnecessary to reach this issue.

There is no question that Tenzer failed to pay any of his tax liability prior to his criminal investigation. Rather, at issue is whether Tenzer's offer in compromise satisfied the requirement that he make bona fide arrangements to pay his tax liability.

The district court stated that:

Insofar as concerns the inadequacy or claimed bad faith in the offer to Compromise (1.3 Million in taxes for $250,000[ ] )[,] this Court concludes that the filing of the Offer (the work of experienced IRS alumnus Honecker and two other tax specialists)[,] laughable as it may be, was not sufficient to disqualify Tenzer f[ro]m the benefits of Voluntary Disclosure. Tenzer acted on the advice of experienced counsel, intending fully to comply with and get the benefit of the Policy.

*United States v. Tenzer,* 950 F.Supp. 554, 562 (S.D.N.Y.1996). We think that the district court erred in finding that the offer alone was sufficient to meet the requirement that there be a bona fide arrangement to pay.

■ An "arrangement to pay" may be a great variety of things, e.g., an installation payment agreement, a promise to pay on a specific date, or an offer of a lump-sum payment in compromise. However, under the express language of the policy, the "bona fide arrangement" must have been "made" for the policy to apply. As with statutory interpretation, we interpret this agency policy in accordance with the plain meaning of its words, unless such a reading "will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Reyes,* 116 F.3d 67, 71 (2d Cir.1997) (quotation omitted) (referring to statutory construction). Under its common usage, an arrangement is "made" when it is "brought about" or "caused to exist." *See Webster's Third New International Dictionary of the English Language Unabridged* 1363 (1981). Thus, the plain language of the policy contemplates that an agreement on a course of payment must exist between the IRS and the taxpayer. The policy is not satisfied by mere offers to make payment; rather, it requires a specific plan, accepted by the IRS, to satisfy outstanding tax liability. Given the plain meaning of the voluntary disclosure policy, Tenzer's rejected offer in compromise clearly is not a bona fide arrangement to pay.

■ Likewise, it is irrelevant that a taxpayer intends to eventually reach an agreement. The policy does not provide for best intentions, but rather requires that an arrangement be "made". Hence, the district court's apparent reliance upon Tenzer's alleged good intentions was erroneous.

■ While the burden of making a bona fide arrangement rests principally on the taxpayer, we note that the government is obligated to negotiate in good faith with the taxpayer toward the end of achieving an arrangement to pay. An arrangement can only be made if the IRS agrees to it, but the IRS may not withhold its assent capriciously or in bad faith. The IRS must afford a taxpayer who has acted in reliance upon the voluntary disclosure policy a reasonable opportunity to satisfy all of the conditions of that policy, including a payment plan. If the parties cannot agree within a reasonable time on a suitable arrangement for payment, then the IRS is justified in refusing to treat that taxpayer as a voluntary discloser.

In the instant case, it is clear that Tenzer was given ample opportunity, including a reasonable length of time, to comply with the voluntary disclosure policy, yet repeatedly failed to do so. At the meeting on January 8, 1993, Kishlansky told Tenzer's attorneys that if Tenzer wanted the IRS to consider an offer in compromise, he would have to start to become current on accruing taxes and make all required estimated tax payments. Nevertheless, when Tenzer filed his 1992 return in April of 1993, he failed to pay any of the $135,665 tax due. Nor did Tenzer make estimated tax payments during 1992. Furthermore, Tenzer disregarded Kishlansky's instructions of January 8, 1993 that he divest himself of several assets and begin making monthly payments of $7,000 toward his tax liability. Moreover, when Kishlansky told Tenzer that any offer in compromise would have to be substantial, and that a reasonable offer from Tenzer would be approximately $600,000, Tenzer offered only $250,000. When this amount was firmly (and predictably) rejected, Tenzer indicated not that he

would offer more, but rather, that he planned to resubmit the same offer with a more detailed explanation attached. The district court, while noting that the offer was "laughable," nonetheless found that Tenzer had made a bona fide arrangement to pay. *Tenzer*, 950 F.Supp. at 562. That finding is insupportable. Tenzer failed at every turn to make an arrangement to pay, notwithstanding the opportunities extended by the IRS to do so. Thus, having thoroughly failed to bring himself within the letter of the voluntary disclosure policy, Tenzer cannot now claim the benefits of any protection it affords.

## II. Solicitation of 1990 Return

■ Section (31)360(2) of the CCDM, entitled "Solicitation of Returns," provides in relevant part that "[a]bsent unusual circumstances prosecution should not be recommended when a return is solicited and received prior to the taxpayer being contacted by the Criminal Investigation Division." CCDM § (31)360(2)(b)(2). The government argues that the district court erred in finding Count Four of the Information, which relates to Tenzer's 1990 tax return, was barred by the IRS's failure to adhere to its non-solicitation policy. We agree.

Although an individual might be entitled to relief where an agency fails to adhere to its rules or regulations, *see Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.1994), this case does not implicate a rule or regulation of the IRS. First, the policy merely advises agents that prosecution generally should not be recommended because solicitation will be detrimental to the prosecution. *See* CCDM § 31(360)(2)(b) ("The Department of Justice considers the active solicitation of a return as detrimental to a criminal case in that the defense can be expected to argue that the prosecution was instituted because of the unsuccessful attempt to dispose of the matter civilly and as a substitute for unsuccessful collection."). Rather than providing a rule

governing when prosecution should be recommended, the non-solicitation policy is only one of several factors to be considered before referring a case for prosecution. The CCDM in no way prohibits prosecution in every case where there has been a solicitation and cannot possibly be construed as a grant of immunity to a taxpayer who files a return in response to solicitation.

Moreover, neither Tenzer nor the public may reasonably rely on the IRS's non-solicitation policy. The policy is a purely internal one, designed for the guidance of IRS agents. It is neither directed to the public nor publicized. Indeed, Tenzer's highly sophisticated counsel had never heard of the policy until preparing for the hearing, and Tenzer does not argue that he was aware of the policy. Therefore, the district court improperly determined that the IRS's non-solicitation policy provided an independent basis for dismissal of Count Four of the Information.

## III. Suppression of Evidence

■ Tenzer argues that, if we allow his prosecution to go forward, we should suppress all of his voluntarily produced documents and the fruits thereof, pursuant to *Shotwell*, 371 U.S. at 347, 83 S.Ct. at 453. In particular, Tenzer argues that his disclosures were made in reliance on the promises by the government that he would not be prosecuted.[2] We disagree.

Under *Shotwell*, evidence obtained under a promise of immunity must be suppressed in any subsequent prosecution. *Id.* However, *Shotwell* also held that the IRS's pre–1952 voluntary disclosure policy was not a promise of immunity in the coercive sense. *See id.* at 348–49, 83 S.Ct. at 453–54 ("The voluntary disclosure policy left them wholly free to disclose or not as they pleased. In choosing to act as they did, petitioners, far from being the victims of that policy, were volunteers for its benefits.").[3] Because neither the pre- nor

---

2. Although brought before the district court as an alternative to dismissing the Information, the district court did not reach this claim.

3. Tenzer also argues that Kishlansky represented that he was not the subject of criminal investigation, and thus tricked him into voluntarily disclosing incriminating information. Tenzer claims that the voluntarily disclosed documents should be suppressed because, under *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir.1977), information voluntarily produced by a taxpayer cooperating with what he believes to be a civil

post–1952 versions of the voluntary disclosure policy are promises of immunity for Fifth Amendment purposes, there is no basis in law to support suppression of Tenzer's voluntarily disclosed documents.

## CONCLUSION

Reversed and remanded.

investigation must be suppressed if he was misled and the investigation really was criminal. However, the district court found that Tenzer was not misled into believing that a criminal investigation would not occur. Rather, when asked, Kishlansky told him that no criminal investigation was underway at that time. There is no clear error in the district court's finding that Tenzer was not misled.