John CRYSTAL; Victoria Crystal;
John Crystal Pools, Inc.,
Petitioners–Appellants,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 97–56204.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1999.

Decided April 16, 1999.

Gary S. Lincenberg (argued) and Thomas R. Freeman, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, California, for the petitioners-appellants.

Charles E. Brookhart and Marion E.M. Erickson (argued), United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

Before: PREGERSON and RYMER, Circuit Judges, and BURRELL,* District Judge.

Opinion by Judge RYMER;
Concurrence by Judge PREGERSON.

RYMER, Circuit Judge:

John Crystal, Victoria Crystal, and Crystal Pools, Inc. appeal summary judgment in favor of the government denying their petition to quash and ordering enforcement of third party summonses issued by the Criminal Investigations Division ("CID") of the Los Angeles District of the Internal Revenue Service. The Crystals initiated contact for a voluntary disclosure with the Southern California District (where they lived), and were told by the Chief of the CID for that district that there was no prior IRS activity. Although incorrect, because a preliminary investigation was underway in the Los Angeles CID office, the district court found this was a case of the left hand not knowing what the right hand was doing. It concluded that while the government's conduct may have been careless, the summonses were not issued in bad faith. We agree, and as we have jurisdiction, 28 U.S.C. § 1291, we affirm.

---

* Honorable Garland E. Burrell, Jr., United States District Judge for the Eastern District of California, sitting by designation.

## I

On May 13, 1996, the Crystals engaged Roger M. Olsen to represent them and on the same day, Olsen called Richard Speier, Jr., Chief of the CID office in Los Angeles. Without revealing the taxpayers' names or business, Olsen asked whether a voluntary disclosure should be done with the CID office in Los Angeles, where his clients' business was located, or in the Southern California District, where they lived. Speier indicated that voluntary disclosures are generally handled in the district where the taxpayer resides. Olsen then called the Chief of the CID for the Southern California District, Wayne McEwan. Again without identifying the taxpayers, Olsen told McEwan that his clients wanted to file amended returns, that the additional income they intended to report was from legal sources, that he was not aware of any IRS investigations pertaining to his clients, and that his clients' business lawyer had contacted the Los Angeles Police Department about a former employee who had embezzled over $500,000 and threatened to contact the IRS.[1] McEwan confirmed that the IRS still had a voluntary disclosure policy that permitted taxpayers to amend their returns without threat of criminal prosecution, and that Olsen's clients would qualify based on the preliminary profile given to him. After conferring with his clients, Olsen disclosed their identities to McEwan and faxed McEwan a confirmation letter with a powers of attorney attachment, dated May 23, which indicated that he wanted "to be sure that no prior activity of the above taxpayers has been initiated by the Internal Revenue Service-audit, collections, investigations, etc., for purposes of the timeliness of such a disclosure." McEwan requested a records check from CID records, as well as the Examination and Collection divisions, but turned up nothing on taxpayers. He re-

---

1. The parties differ to some extent about what was said when, but in reviewing summary judgment in the government's favor, we must view the evidence in the light most favorable to taxpayers.

ported this to Olsen on June 5. Olsen and McEwan then had several telephone conversations during which Olsen outlined "the details of the tax issues and facts relating to the Crystals and Crystal Corp." The last conversation occurred at the end of July, when McEwan agreed to allow the Crystals time to complete their amended returns and advised Olsen that this created no problem for their voluntary disclosure. At some point, the Crystals made a $2,500 payment to the IRS in anticipation of settling their tax deficiencies,[2] but they never completed or filed amended returns.

Meanwhile, on May 15, 1996, an informant came in to the Los Angeles CID office with information about taxpayers' tax liability for the years 1991–1995. As a result, a preliminary investigation was opened on June 3 and assigned to Special Agent Linda T. Russell. Because the Crystals lived in Laguna Niguel, Speier sent a Request for Investigative Jurisdiction (to initiate a criminal investigation) to McEwan, which McEwan signed July 26, 1996. On August 22, the Los Angeles CID office initiated a full (or "subject") investigation of taxpayers, which was also assigned to Russell. As part of the investigation, Russell contacted John Crystal on August 27, who referred her to Olsen. On September 4, Olsen spoke with Speier, who said he was unaware of the pending voluntary disclosure with the Southern California CID office, and with McEwan, who said he was not aware there was a pending investigation of taxpayers by the Los Angeles CID office. Thereafter, Russell issued summonses to various record custodians and to two Crystal entities.

Taxpayers filed a petition and a supplemental petition requesting the district court to quash the summonses or, in the alternative, to conduct discovery. The petition alleges that the Crystals were misled by the affirmative misrepresentations of the IRS that it was not conducting a criminal investigation, as a result of which they made voluntary disclosures, and that the

investigation was not being conducted in good faith. The government moved for summary judgment on the grounds that the voluntary disclosure policy creates no rights for taxpayers, and that they failed to show that enforcement of the summonses would be an abuse of the court's process. The district court allowed taxpayers to depose McEwan, Speier and Russell. After supplemental papers were filed, the court granted the government's motion for summary judgment. It concluded that even if the voluntary disclosure were timely and the Crystals had made an actual disclosure, the IRS was not precluded from using third party summonses to certify the accuracy of their disclosures or from investigating the Crystals. The court also determined that the testimony at best tended to show that the government acted carelessly, but that it did not disclose bad faith on behalf of McEwan or any other IRS employee. Accordingly, it found that the summonses were issued in good faith.

Taxpayers have timely appealed the district court's ruling.

## II

■ The IRS may issue a summons only for the purposes set out in 26 U.S.C. § 7602(a). *See United States v. LaSalle National Bank*, 437 U.S. 298, 316 n. 18, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). Those purposes are "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax ... or collecting any such liability." 26 U.S.C. § 7602(a). Section 7609(b)(2)(A) permits a taxpayer identified in an IRS summons served on a third party recordkeeper to begin a proceeding to quash the summons; in turn, the government may seek to compel compliance. To defeat a petition to quash, or to enforce a summons, the government must establish that (1) the investigation will be conducted for a legitimate purpose; (2) the material being

---

**2.** There is no copy of the check in the record, and no indication that any IRS official in the Los Angeles or Southern California CID offices knew about it.

sought is relevant to that purpose; (3) the information sought is not already in the IRS's possession; and (4) the IRS complied with all the administrative steps required by the Internal Revenue Code. *See United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). "The government's burden is a slight one, and may be satisfied by a declaration from the investigating agent that the *Powell* requirements have been met." *United States v. Dynavac, Inc.,* 6 F.3d 1407, 1414 (9th Cir.1993). The burden is minimal "because the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted." *Liberty Fin. Servs. v. United States,* 778 F.2d 1390, 1392 (9th Cir.1985). Here, it is undisputed that Special Agent Russell's declaration satisfies all of the *Powell* requirements. Therefore, the government established a prima facie case to enforce the summonses.

■ Once the government has established the *Powell* elements, " 'those opposing enforcement of a summons ... bear the burden to disprove the actual existence of a valid civil tax determination or collection purpose by the Service.... Without a doubt, this burden is a heavy one.' " *United States v. Jose,* 131 F.3d 1325, 1328 (9th Cir.1997) (en banc) (quoting *LaSalle,* 437 U.S. at 316, 98 S.Ct. 2357). As we observed in *Derr,* "[e]nforcement of a sum-

mons is generally a summary proceeding to which a taxpayer has few defenses." *United States v. Derr,* 968 F.2d 943, 945 (9th Cir.1992). " 'The taxpayer must allege specific facts and evidence to support his allegations' of bad faith or improper. purpose." *Jose,* 131 F.3d at 1328 (quoting *Liberty,* 778 F.2d at 1392).[3]

■ "The taxpayer 'may challenge the summons on any appropriate grounds,' including failure to satisfy the *Powell* requirements or abuse of the court's process." *Id.* (quoting *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964)). "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell,* 379 U.S. at 58, 85 S.Ct. 248. In addition, it has become clear since *Powell* that gathering evidence after having decided to make a recommendation for prosecution would be an improper purpose, and that the IRS would be acting in bad faith if it were to pursue a summons enforcement under these circumstances. *See LaSalle,* 437 U.S. at 314, 98 S.Ct. 2357; *Jose,* 131 F.3d at 1328.[4] While neither the *Powell* elements nor the *LaSalle* requirements is an exhaustive elaboration of what good faith means, still the "dispositive question in

**3.** The Crystals ask us to adopt the burden-shifting system for determining whether the IRS acted in bad faith that the First Circuit embraced in *United States v. Gertner,* 65 F.3d 963 (1st Cir.1995), and to hold that the IRS bears the burden of proving that its summonses should be enforced. *Gertner* found it unnecessary to make a definitive decision about the significance of the presumption in favor of the IRS and whether the burden of persuasion ultimately is on the government, but suggested in dicta that it should be. No other court has picked up on the *Gertner* approach, nor are we free to consider doing so here, as we established the parties' burdens in *Liberty* and reaffirmed them in *Jose.*

**4.** In *LaSalle,* the Court summarized the requirements that had emerged for enforcement of an IRS summons as follows:

First, the summons must be issued before the Service recommends to the Department of Justice that a criminal prosecution, which reasonably would relate to the subject matter of the summons, be undertaken. Second, the Service at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602. This second prerequisite requires the Service to meet the *Powell* standards of good faith. It also requires that the Service not abandon in an institutional sense ... the pursuit of civil tax determination or collection.

*LaSalle,* 437 U.S. at 318, 98 S.Ct. 2357; *see also id.* at 317 n. 19, 318 n. 20, 98 S.Ct. 2357.

each case" is "whether the Service is pursuing the authorized purposes in good faith." *LaSalle,* 437 U.S. at 317 n. 19, 98 S.Ct. 2357.

## III

The Crystals acknowledge that the summonses here were not issued for one of the improper purposes identified in *Powell* or *LaSalle,* but argue that we should nevertheless "reign-in" the IRS where it has effectively used the voluntary disclosure program as a trap to lull taxpayers into compromising their constitutional rights. They point out that the Supreme Court made it clear in *LaSalle* that "[f]uture cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process." *Id.* at 318 n. 20, 98 S.Ct. 2357. In their view, this is one of the "future cases" of abuse that *LaSalle* empowers us to correct.

Specifically, the Crystals raise three issues that focus on McEwan's representation that taxpayers were not subjects of any pending IRS activity. First, they submit that the IRS's misrepresentation constituted bad faith because the IRS may not falsely represent that a taxpayer is qualified to make a voluntary disclosure and thereby induce the taxpayer to admit wrongdoing. Second, the Crystals argue that McEwan's lack of personal knowledge of the pending investigation cannot insulate the IRS from responsibility for misrepresentations because ordinary agency principles should be applicable to the government. Under those principles, knowledge is imputed so that the agency is responsible as if the misrepresentations had been made knowingly. Finally, they argue that the IRS is responsible for its false representations because it failed to follow established procedures for preventing the type of misrepresentation that occurred in this case.

The government counters that there is no basis for imputing bad faith, because

there was none on any employee's part, or for presuming that the summonses were issued for an improper purpose simply because taxpayers were misinformed about the existence of an investigation when they initiated a voluntary disclosure. Rather, the summonses were issued for a proper purpose as part of an investigation precipitated by information from an informant, not from taxpayers' voluntary disclosure. Even if taxpayers were entitled to some relief on account of having initiated the voluntary disclosure process, the government suggests that such relief would be premature because under published IRS guidelines, voluntary disclosure is to be considered in making a decision about whether to recommend criminal prosecution, but not in making a decision to investigate the taxpayers' liabilities; that recommendation stage has not been reached, and may never be reached, in the Crystals' case. In any event, the government points out, taxpayers' disclosure here was neither timely nor complete.

■■■ Having reviewed the record de novo,[5] we are satisfied that there was no bad faith on anyone's part. What happened to the Crystals comes down to happenstance. We decline the invitation to impute bad faith, when there was none to begin with, or to presume a causal connection between taxpayers' voluntary disclosure of their names and intention to file amended returns, and the issuance of the summonses, when none exists in fact. Instead, we simply hold in accordance with settled principles that these summonses were not issued for an improper purpose or in bad faith.

## A

Few reported cases have discussed the IRS's voluntary disclosure policy, but the Second Circuit had occasion to outline its genesis in *United States v. Tenzer,* 127 F.3d 222, 226 (2d Cir.1997), from which we

---

**5.** The government urges us to employ a clear error standard of review, *see United States v. Blackman,* 72 F.3d 1418, 1422 (9th Cir.1995) (decision to enforce IRS summons reviewed for clear error), but this appeal is from the grant of summary judgment.

borrow liberally to provide context for the Crystals' argument. *See also United States v. Hebel,* 668 F.2d 995 (8th Cir. 1982). Before 1952, the Treasury Department basically offered immunity to taxpayers who made a clean breast of things. *See Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 348–49, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963) (describing early version of voluntary disclosure policy). On January 10, 1952, the Department changed this position, declaring it to be "the policy of the Treasury Department to recommend criminal prosecution in every case where the facts and circumstances warrant that action." Treas.Decl. S–2930 (Jan. 10, 1952). The IRS reaffirmed this policy in 1961 and incorporated it into the Internal Revenue Manual (IRM) in 1973.[6] Essentially the same policy has continued in effect ever since. At the time the Crystals initiated their inquiry, the Manual provided:

> (1) It is the practice of the Internal Revenue Service that a voluntary disclosure will be considered along with all other factors in the case in determining whether criminal prosecution will be recommended.

> (2) A voluntary disclosure will not of itself guarantee immunity from prosecution, yet a voluntary disclosure may result in no prosecution recommendation. However, since the IRS's application of the voluntary disclosure practice does not automatically result in immunity from criminal prosecution, taxpayers should be advised that they cannot rely

on the fact that others may not have been prosecuted.

IRM 9781, HB § 342.142(1), (2) Guidelines (Aug. 25, 1995).

A voluntary disclosure occurs when the communication is truthful, timely, complete, and when the taxpayer cooperates with the IRS in determining the correct tax liability, so long as the disclosure is received before the IRS has initiated an inquiry that is likely to lead to the taxpayer, which the taxpayer is thought to be aware of, and the taxpayer does not know of some event that is likely to cause an audit. *See* IRM 9781, HB § 342.142(3), (4).[7] When faced with a taxpayer who wants to make a voluntary disclosure, the IRS agent should tell the taxpayer that a voluntary disclosure does not bar criminal prosecution, but rather is a factor to be considered. *See* IRM 9781, HB § 342.142(5). The IRM also states that "[t]he IRS's voluntary disclosure practice creates no substantive or procedural rights for taxpayers, but rather is a matter of internal IRS practice, provided solely for guidance to IRS personnel." IRM 9781, HB § 342.142(7).

Most large districts have a Criminal Investigation Division. A CID is responsible for developing information about alleged criminal violations of the income tax laws, investigating and evaluating suspected violations, and recommending prosecution when warranted. *See* IRM 11(12)1.31(1) (Aug. 6, 1991). However, the CID Chief

---

**6.** The 1961 statement explained that "even true voluntary disclosure of a willful violation will not, of itself, guarantee prosecution immunity. At the same time, the Service will carefully consider and weigh it, along with all other facts and circumstances, in deciding whether or not to recommend prosecution." I.R.S. News Release IR–432 (Dec. 13, 1961). The 1973 IRM provision stated that a voluntary disclosure may be "significant" in the IRS's decision whether to recommend prosecution, but "does not necessarily preclude prosecution." IRM § P–9–2 (Jan. 19, 1973).

**7.** These guidelines provide in full:

(3) A voluntary disclosure occurs when the communication is:

(a) Truthful;
(b) Timely;
(c) Complete; and,
(d) When the taxpayer shows a willingness to cooperate (and does in fact cooperate) with the IRS in determining his/her correct tax liability.

(4) A disclosure is timely if it is received before:
(a) The IRS has initiated an inquiry that is likely to lead to the taxpayer, and the taxpayer is reasonably thought to be aware of that investigative activity; or
(b) Some event known by the taxpayer occurred, which event is likely to cause an audit into the taxpayer's liabilities.

IRM 9781, HB § 342.142(3), (4).

may initiate investigations only of taxpayers under the jurisdiction of the district. *See* IRM 9143.1(1) (Mar. 25, 1992). Thus, when Olsen made his blind call to find out where voluntary disclosure should be initiated for taxpayers who lived in Laguna Niguel, but whose business was in Los Angeles, he was referred by the Los Angeles CID Chief to the Chief of the Southern California CID. Likewise, once it became apparent that the targets of the informant's tip resided out of the district, the Chief of the Los Angeles CID office (Speier) was obliged to coordinate with the Chief of the Southern California CID office (McEwan) to establish which district would control the investigation. *See* IRM 9143.1(1)(b). In this case, Speier sent McEwan a Request for Investigative Jurisdiction, which sought McEwan's concurrence "in accordance with IRM 9143.1 to initiate a criminal investigation by the Los Angeles District Criminal Investigation Division on the subject for the 1991 through 1995 tax years." When McEwan signed off, responsibility for the investigation remained in Los Angeles. *See* IRM 9143.1(6).

## B

The heart of taxpayers' case is McEwan's representation to Olsen on June 5, 1996, that there was no prior activity by the IRS regarding the Crystals. This was truthful so far as McEwan knew, but was nonetheless mistaken.[8] McEwan had no personal knowledge of any such activity, and his data check turned up nothing about Russell's conversation with the informant on May 15, or the fact that a preliminary investigation had been opened on June 3. We assume this was because Russell did not complete a Form 3949 "Information Item" detailing her May 15 interview with the informant, or flag the taxpayers' account by placing a "914 control" in the nationwide database-both of which could or should have been done, and either of which would have alerted McEwan to the Los Angeles CID office investigation.[9] However, there is no evidence that Russell intentionally failed to input this data or hoped to gain anything from it; she simply didn't do it. It was not until Russell telephoned Crystal three months after she opened the preliminary investigation (and a week after the "subject" investigation was opened) that she learned of the voluntary disclosure begun in May in the Southern California CID office.[10] Therefore, even if she were negligent, her conduct was neither fraudulent nor deceitful. By the same token, had McEwan inputted the Powers of Attorney forms, Russell might have been clued in to taxpayers' contact with another CID at an earlier point in her investigation. Yet there is no evidence suggesting that McEwan intentionally failed to input the forms in order to elicit information for the Los Angeles investigation; at best, the evidence shows that both agents were un-

8. There is room to disagree about what Olsen's query regarding "prior activity" meant, but we construe it broadly because the reality is that McEwan did not know or believe that *any* activity or investigation was underway. As of June 5, there was an investigation, although it was only preliminary. A full criminal investigation was not initiated until August 26, over two and a half months later.

9. We construe these facts in the Crystals' favor, as we must on summary judgment. In fact, Russell did place a "914 control" on the taxpayers' account when the investigation was upgraded to a full or "subject" investigation. There is no evidence that she was required to place such a control before this time.

10. The Crystals contend that Russell's discovery of the voluntary disclosure affected the investigation and supports a reasonable inference that Olsen's disclosures to McEwan were linked to issuance of the summonses. We disagree as after discovery, they can point to no evidence that Russell's decision to issue the summonses was in any way influenced by the knowledge that taxpayers had initiated voluntary disclosure. Regardless, the published guidelines expressly contemplate the possibility of a prosecution, and thus of an investigation, even when voluntary disclosure is complete.

aware of or overlooked procedures for data collection. This leaves as the only basis for inferring bad faith the mere fact that internal procedures were not followed. However, courts are uniformly of the view that internal rules of agency procedure confer no substantive rights on taxpayers. *See, e.g., Groder v. United States,* 816 F.2d 139, 142 (4th Cir.1987) (citing cases).

Nor is there any basis for inferring that the purpose of McEwan's honest but mistaken representation was pretextual, or that information provided to him as a result of the voluntary disclosure was used in any way to further the Los Angeles CID investigation. The informant had already contacted the Los Angeles CID office before the Crystals contacted the Southern California office. Olsen gave McEwan the names of taxpayers before McEwan represented that there was no pending IRS activity. Russell already had taxpayers' names from the informant. Beyond that, the only substantial information conveyed to McEwan was taxpayers' intention to file amended returns,[11] but that information was not communicated to Russell before Russell upgraded her investigation to a full or subject investigation. Even so, Russell found out about taxpayers' voluntary disclosure efforts from taxpayers-not from McEwan. Thus, there is no basis in the record for concluding that taxpayers gave up information that mattered to the decision to proceed with a subject investiga-

tion, or compromised their constitutional rights on account of being tricked by the voluntary disclosure program.

Recognizing that McEwan did not have actual knowledge of the CID investigation that had been initiated in Los Angeles, the Crystals essentially contend that we should put two and two together by imputing knowledge of the investigation to McEwan; converting his mistaken representation about no prior activity into an intentional or at least reckless misrepresentation in light of his imputed knowledge; and holding that the IRS, through McEwan, obtained inculpatory information by fraud, deceit or trickery similar to that in *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977) (suppressing evidence so obtained in criminal tax prosecution), and *SEC v. ESM Gov't Securities,* 645 F.2d 310 (5th Cir. Unit B May 1981) (applying *Tweel* in subpoena-enforcement context). However, *Tweel* and *ESM* involved very different situations from this case because the agents in each made intentional misrepresentations to procure information the taxpayers otherwise would not have produced. In *Tweel,* the taxpayer was prosecuted for tax evasion and moved to suppress evidence obtained through an audit. When asked by the taxpayer's accountant whether a "special agent" was involved (to discover whether the inquiry was criminal or civil), the agent said no, without disclos-

11. Olsen's declaration states that between June 5 and the end of July, he also outlined the "details of the tax issues and facts relating to the Crystals and Crystal Corp." for McEwan. As conclusory as it is, this statement is not substantial evidence that anything significant was disclosed. Regardless, even if fully credited, Olsen's disclosure is not of consequence in the absence of evidence that this information was communicated to Russell or in any way motivated her decision to upgrade the investigation or to issue the summonses. The same is true of Olsen's conversation with McEwan about a delay in filing amended returns, which occurred after McEwan signed the Request for Investigative Jurisdiction. McEwan testified that he did not focus on the fact that the Request pertained to taxpayers who had talked with him about making a voluntary disclosure. But even assuming that

at that point McEwan knew, or should have known, of an investigation in the Los Angeles office that was likely (after his agreement) to turn into a criminal investigation of taxpayers in a voluntary disclosure program, there is no evidence that he was told anything by the Crystals after he signed the Request that he did not know before he signed it. Nor is there any basis for inferring that McEwan concealed the fact that a full investigation was likely in order to elicit further information to use in connection with it. He never told the Los Angeles CID office anything about the Crystals, their voluntary disclosure efforts, or what Olsen had told him. Russell had no information from McEwan before deciding to issue the summonses. There is no dispute about this, and thus no triable issue of fact exists simply because of the IRS's timing in issuing the summonses.

ing that the audit was conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice-which is only involved in criminal investigations. Applying the Fifth Circuit's rule that a consent search is unreasonable under the Fourth Amendment if induced by an IRS agent's deceit, trickery or misrepresentation, the court found that the agent's failure to tell the taxpayer of the "obvious criminal nature of this investigation was a sneaky deliberate deception by the agent." *Tweel*, 550 F.2d at 299. In these circumstances, the silent misrepresentation was both intentionally misleading and material, thereby vitiating the taxpayer's consent. Here, by contrast, McEwan's representation was totally innocent, albeit incorrect, and was in no sense a "sneaky deliberate deception."

In *ESM,* the Securities and Exchange Commission had ordered an investigation of ESM but, at the investigator's suggestion, did not issue a subpoena or notify ESM. Instead, the investigator told ESM that he would like an education in the government securities market and as a result, was provided access to ESM documents and procedures. Applying *Tweel*'s "fraud, deceit or trickery" standard to enforcement of an administrative subpoena, the court declined to adopt an automatic exclusionary rule, but rather indicated that the seriousness of the alleged violation should be balanced against the government's good faith and the degree of harm imposed by the unlawful conduct. In the case of ESM, the court reversed the district court's order of enforcement for findings on whether the SEC intentionally or knowingly misled ESM about the purposes of its review of the company's files, whether ESM was in fact misled, and whether the subpoena was the result of the SEC's improper access to ESM's records. *See ESM,* 645 F.2d at 317–18. In this case, there is no triable issue as to whether the IRS intentionally or knowingly misled the Crystals, or issued the subpoenas as the result of any information provided to McEwan. Therefore, *Tweel* and *ESM* do not suggest that we should quash the sum-

monses, nor do we see any reason to extend the *Tweel/ESM* rationale to negligence or recklessness, as the Crystals urge, for both opinions are well-grounded in deliberate deception with serious consequences to the taxpayer, neither of which is present here.

The Crystals also rely on the fact that the Fourth Circuit recognized in *Groder* that bad faith would arise if an IRS agent misrepresented to the taxpayer the possibility of a criminal referral in order to elicit information for use in a fraud investigation. *See Groder,* 816 F.2d at 144. This is surely correct, but here, as in *Groder,* the facts do not measure up to that standard. In *Groder,* the agent failed to suspend a civil audit and refer the case to the CID although the IRS Manual required referral once a "firm indication of fraud" by the taxpayer was discovered. The taxpayer moved to quash the summonses on the ground that the IRS acted in bad faith by improperly delaying referral and by failing to follow its own internal procedures, as a result of which his attorney had been "mousetrapped" into providing information during the course of the civil audit that he might not have provided if he had known that a criminal inquiry might be forthcoming. The court held that neither the agent's incorrect judgment (about how firm the "indication of fraud" was), nor her failure to follow the IRS's internal rules, sufficed to show bad faith. As it emphasized, "[b]ad faith involves fraud or deceit on the part of the government," *id.,* not simply an agent acting unreasonably or unsatisfactorily. *See id.* at 145. *Groder* is therefore closer to this case than either *Tweel* or *ESM,* and supports the district court's conclusion that carelessness is different from bad faith.

C

The Crystals argue that the district court's conclusion that carelessness does not constitute bad faith is wrong because the IRS as an institution is deemed to have acted with knowledge imputed to McEwan. As they see it, even if McEwan did not

subjectively act in bad faith, the IRS's imputed knowledge establishes its culpability for intentional or reckless misrepresentations. They contend that the district court should have applied established principles of agency law and that if it had, the court would have concluded that McEwan had constructive knowledge of the Los Angeles CID's activities at the time he represented to taxpayers that there was no prior activity because the facts concerning the pendency of the IRS investigation were uniquely within the IRS's control; the IRS had reason to know that McEwan, as District Chief, would be called upon to provide information concerning the pendency of an investigation to taxpayers seeking to make a voluntary disclosure; and imposing the burden of making this information available to those responsible for negotiating voluntary disclosures is not undue.

In support, the Crystals rely on the Seventh Circuit's opinion in *2121 Arlington Heights Corp. v. IRS,* 109 F.3d 1221 (7th Cir.1997), for the proposition that it is the bona fides of the IRS as an institution-not of an individual agent-that counts; and on cases such as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Thomas v. INS,* 35 F.3d 1332 (9th Cir.1994), to argue that government agencies, like private corporations, are generally subject to common law principles of agency. However, both lines of authority are inapposite. In *2121 Arlington,* an IRS agent threatened to ruin the taxpayer's business and allegedly did other things to pressure the taxpayer into settling its tax liability. The taxpayer sought to quash the summons on the ground of the agent's bad faith. In declining to do so, the court applied *LaSalle*'s "institutional posture" test and required the taxpayer to show that the IRS, as an institution, issued the summons with an improper purpose. *See 2121 Arlington,* 109 F.3d at 1226. Nothing in *2121 Arlington* suggests that the knowledge or motivation of one

agent must be imputed to another; indeed, the opposite is true, as the court makes clear that even if the motivation of the agent requesting a summons is suspect, the summons may nevertheless be enforced absent a showing that the improper motivation somehow "infected the institutional posture of the IRS." *Id.* Here, as in *2121 Arlington,* there is no evidence that Russell or Speier, who were responsible for the Los Angeles CID investigation and for issuing the summonses, were motivated by any illegitimate purpose.

Neither do the agency principles recognized in cases such as *Giglio* and *Thomas* mean that the IRS's summonses should not be enforced. Both the stakes and the standards are different in those cases. In *Giglio,* the government failed to disclose that a promise of immunity had been given by an Assistant United States Attorney (AUSA) to the defendant's coconspirator and the only witness linking the defendant with the crime. The AUSA who tried the case did not know about the promise. The defendant was convicted. In holding that a new trial was required, the Court noted that "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763. Similarly, in *Thomas,* a United States Attorney promised on behalf of "the government" not to oppose Thomas's application for discretionary relief from deportation in exchange for information. However, the government did oppose Thomas's application, arguing that the INS was not bound by the United States Attorney's promise. We precluded the government from opposing Thomas's motion for relief, which he sought on due process grounds.

In this case, we are not concerned with the materiality of evidence or with the government's discovery obligations in a criminal proceeding, nor with the breach of an agency's promise.[12] As Olsen's letter

---

**12.** The Crystals suggest that plea bargains are analogous, but as we explain, the IRS Manual explicitly states that a voluntary disclosure

does not immunize a taxpayer from prosecu-

reflects, he sought McEwan's confirmation of no prior activity to be sure that taxpayers' voluntary disclosure would be timely.[13] When McEwan responded affirmatively, he did not promise that the IRS would not investigate the Crystals. Indeed, the IRS's published guidelines are quite up front about the fact that a voluntary disclosure (even if completed) does not guarantee immunity from prosecution. *See* IRM 9781, HB § 342.142(2). As the Eighth Circuit remarked in refusing to vacate convictions for criminal violation of the income tax laws of taxpayers who had made voluntary disclosures, filed amended returns, and paid the tax due:

> Regardless of whether a taxpayer actually benefits or suffers detriment from voluntarily disclosing and rectifying faulty tax returns, that disclosure itself does not insulate the taxpayer from prosecution under any administrative policy or practice recognized by this court. Taxpayers and their attorneys cannot rely on a long-since abandoned policy of non-prosecution when taxpayer voluntarily discloses violation of the tax laws.

*Hebel,* 668 F.2d at 999. Of course there has been no prosecution in this case, but if completing a voluntary disclosure does not immunize taxpayers from prosecution, *a fortiori* initiating a voluntary disclosure cannot immunize them from investigation.[14] In any event, unlike a *Giglio* question, which involves the extent of the

government's turn-over obligation in a criminal prosecution, the question in cases involving the enforcement of tax summonses is whether the IRS is "pursuing the authorized purposes [of § 7602] in good faith." *LaSalle,* 437 U.S. at 317 n. 19, 98 S.Ct. 2357. Because the Crystal summonses were issued pursuant to the statutory purposes of § 7602(a) before the IRS had decided whether to prosecute, we are not persuaded that the rationale of *Giglio* and its progeny should apply so as to deem McEwan to have acted on behalf of the IRS with constructive knowledge that his statements were false.

The Crystals say that we should follow *Tonelli v. United States,* 60 F.3d 492, 495 (8th Cir.1995), which recognized that if the Post Office's internal procedures required its agents to report certain facts to superiors and they failed to do so, the Post Office would nevertheless be deemed to know all facts that would have been known had established procedures been followed. However, *Tonelli* and *United States v. Georgia–Pacific Co.,* 421 F.2d 92 (9th Cir. 1970), upon which taxpayers also rely, both involved an issue that is not present in this case-whether the government had authorized an employee's conduct. Each held, under ordinary agency principles, that the principal is bound by the knowledge of what its agent does concerning a matter upon which it is the agent's duty to report. *See Tonelli,* 60 F.3d at 495; *Georgia–Pacific,* 421 F.2d at 97 & n. 9. Neither sug-

tion, and there is no evidence of any promise to the contrary.

13. Although the government argues that the disclosure was untimely in any event because the Crystals knew that a former employee was about to spill the beans, we do not need to decide the effect of McEwan's representation on this element of taxpayers' voluntary disclosure. *See* IRM 9781, HB § 342.142(3), (4).

14. The Crystals suggest that once a voluntary disclosure program is begun, no investigation should take place until taxpayers have been given a chance to complete it. *See Tenzer,* 127 F.3d at 227 (noting that "[w]hile the burden of making a bona fide arrangement rests principally on the taxpayer, ... the gov-

ernment is obligated to negotiate in good faith with the taxpayer toward the end of achieving an arrangement to pay"). We express no view on this for two reasons. First, the record discloses no attempt by the Crystals to complete the disclosure. The second, related reason is that the issue does not appear ripe to us, for it is necessarily wrapped up in whether the disclosure was timely. *See* IRM 9781, HB § 342.142(3), (4). The record on this point is not developed. However, the taxpayers are not foreclosed from challenging the indictment (as in *Tenzer* ) or moving to suppress evidence (as in *Tweel* ), if and when a recommendation for prosecution is made and an indictment is returned. *See Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971).

gests that the knowledge of one IRS agent (Russell) should be imputed to another (McEwan), who is not her superior, so as to transform McEwan's mistaken statement into a false one that taints a wholly independent investigation.

## D

The Crystals' remaining contentions fail in light of conclusions we have already reached. First, they challenge the notion that they must show a connection between their disclosures to McEwan and Russell's decision to issue the summonses. They claim that such a requirement would render the bad-faith test a dead letter in the context of voluntary disclosure because, as a practical matter, taxpayers would have to extract from Agent Russell an admission that she issued the summonses in bad faith.[15] Instead, to protect the integrity of the tax-investigation system and constitutional rights, they ask us to impose an irrebuttable presumption of a causal connection between issuance of an IRS summons and the agency's bad faith conduct where the criminal investigation is tainted by the agency's receipt of inculpatory information, the revelation of which was induced by false representations made during a voluntary disclosure. We decline to do so, as presuming bad faith not only would turn the taxpayers' "heavy" burden to show bad faith or improper purpose on its head, see *LaSalle,* 437 U.S. at 316, 98 S.Ct. 2357; *Powell,* 379 U.S. at 58, 85 S.Ct. 248, but also would effectively overrule our own requirement that the taxpayer " 'allege specific facts and evidence to support his allegations' of bad faith or improper purpose." *Jose,* 131 F.3d at 1328 (quoting *Liberty,* 778 F.2d at 1392).

Next, the Crystals contend that as a matter of policy, the IRS must be responsible for the actions of its own agents acting within the course and scope of their institutional roles, at least when those in-

stitutional actors make representations reasonably and detrimentally relied upon by taxpayers. They argue that as a direct result of McEwan's representation, further acts incriminating them occurred. Specifically, following the advice of Olsen, they talked freely to the District Attorney who was investigating the embezzlement. Olsen then told McEwan that this had happened, and retained the Crystals' regular accountant to assist him with the amended tax returns and voluntary disclosure. However, there is no evidence that taxpayers' reliance was either reasonable or detrimental. The published guidelines specifically state that taxpayers are not immunized from a criminal prosecution simply because they have made a voluntary disclosure, and that taxpayers should not rely on the fact that others have not been prosecuted. *See* IRM 9781, HB § 342.142(1), (2). McEwan never promised Olsen or taxpayers otherwise. Therefore, even if McEwan's statement had been accurate and there had been no activity underway in the Los Angeles CID office at all, the risk that Olsen advised his clients to take would have been precisely the same. In any event, there is no evidence that the summonses were based on any information obtained through the voluntary disclosure program, and there has been no decision to recommend prosecution. Accordingly, the prospect of favorable consideration will still be alive when the time comes for the Los Angeles CID to decide whether to recommend prosecution.

## CONCLUSION

As the district court recognized, the IRS's conduct was less than optimum; like the district court, we do not condone carelessness in failing to assure that more accurate information was available. However, the summonses were not issued in

---

15. In fact, in this case, the district court gave the Crystals ample opportunity for discovery on the issue of bad faith, which is the exception rather than the rule in a summary summons enforcement proceeding. *See Chen Chi*

*Wang v. United States,* 757 F.2d 1000, 1004 (9th Cir.1985). However, they adduced no evidence that the summonses were issued on the basis of *any* information obtained by McEwan.

bad faith or for an improper purpose. Accordingly, they may be enforced.

AFFIRMED.

PREGERSON, Circuit Judge, concurring in the result:

In my view, Judge Dickran Tevrizian, the learned district judge who granted the government's motion for summary judgment, had it right when he said "that while it may be proper for the Government to pursue criminal sanctions against the taxpayers, it would be grossly unfair. This case illustrates the axiom that one hand didn't know what the other hand was doing." Because IRS personnel failed to follow internal procedures, taxpayers and their attorney. who followed proper procedures, now find themselves ambushed.